UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN D. MEYER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED MICROELECTRONICS CORPORATION, SHAN-CHIEH CHIEN, JASON WANG, PO-WEN YEN, and CHITUNG LIU, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Kevin D. Meyer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding United Microelectronics Corporation ("UMC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired UMC securities between

1

October 28, 2015 and November 1, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its senior officials.

2.       UMC was founded in 1980 and is headquartered in Hsinchu City, Taiwan.  UMC provides semiconductor wafer foundry solutions.  Through its two business segments, Wafer Fabrication and New Business, the Company provides circuit design, mask tooling, wafer fabrication, and assembly and testing services.  UMC purports to engage in the research, development, and manufacture of products in the solar energy and light-emitting diode industries.  It serves fabless design companies, and integrated device manufacturers.  UMC operates primarily in Taiwan, Singapore, China, Japan, Europe, and the United States.

3.       UMC's American depositary shares ("ADSs"), each of which represents five ordinary shares, are listed on the New York Stock Exchange ("NYSE") and trade under the ticker symbol "UMC."

4.       On May 13, 2016, the Company announced that it had entered into a Dynamic Random-Access Memory ("DRAM") Technology Cooperation Agreement with Fujian Jianhua Integrated Circuit Co. Ltd. ("Fujian").

5.       Under the agreement, Fujian was to provide UMC with related equipment for its research and development, as well as service fees subject to the progress of the technology development.  UMC was to develop DRAM related technologies for Fujian and deliver such development results to Fujian before May 12, 2021.  The developed technologies were to be jointly owned by both parties.

6.      Fujian was established in early 2016 in the Fujian Province of China for the sole purpose of designing, developing, and manufacturing DRAM.  Fujian was founded with a $5.65 billion investment provided by the People's Republic of China ("PRC") and related entities, and the company's two major shareholders were PRC state-owned enterprises.

7.      DRAM is a memory device product used in electronics to store information. DRAM is a technologically advanced commodity that is widely used in digital electronics, as well as leading-edge computing, consumer, networking, automotive, industrial, embedded, and mobile productions.

8.      At all relevant times, one of UMC's primary competitors has been Micron Technology, Inc. ("Micron"), a leading U.S. semiconductor company known for its development and production of DRAM products.

9.      Throughout the Class Period, Defendants made materially false and misleading statements regarding UMC's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) UMC conspired with Fujian to steal trade secrets from Micron relating to its research and development of DRAM; (ii) UMC hired former Micron employees for the purpose of stealing such information from Micron; (iii) the foregoing conduct placed UMC and certain of its employees at an increased risk of criminal and regulatory investigation by the U.S. government; and (iv) as a result, UMC's public statements were materially false and misleading at all relevant times.

10.      On November 1, 2018, the U.S. Department of Justice ("DOJ") indicted UMC, Fujian, and Chen Zhengkun a.k.a. Stephen Chen ("Chen"), a former Micron employee hired by UMC, for conspiracy to commit economic espionage, conspiracy to commit theft of trade secrets, and economic espionage (receiving and possessing stolen trade secrets).  The indictment

stated that the companies conspired to steal trade secrets from Micron relating to its research and development of memory storage devices.  According to the indictment, the conspiracy to commit economic espionage began in or around January 2016, the conspiracy to commit theft of trade secrets began in or about October 2015, and the economic espionage (receiving and possessing stolen trade secrets) began in or about February 2016.

11.     According to the DOJ's indictment, Chen, a Taiwanese national, resigned as the President of Micron's subsidiary, Micron Memory Taiwan Co., Ltd. ("MMT"), in July 2015. Thereafter, Chen began working for UMC as its Senior Vice President and Fabrication Director in Taiwan in September 2015.  According to the indictment, Chen, as well as agents of UMC, later hired additional former employees of Micron who stole Micron trade secrets and, at the direction of UMC employees, used such trade secrets to enhance UMC's DRAM technologies.

12.     As news of UMC's indictment reached the market, UMC's ADS price fell by $0.19 per share, or nearly 10%, over the following two trading sessions to close at $1.71 per share on November 5, 2018.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).   UMC securities are traded on the NYSE, located within this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

18.     Plaintiff, as set forth in the attached Certification, acquired UMC securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant UMC is incorporated in Taiwan, Republic of China, with principal executive offices located No. 3 Li-Hsin Road II, Hsinchu Science Park, Hsinchu City, Taiwan, Republic of China.   UMC ADSs trade on NYSE under the symbol "UMC."

20.     Defendant Shan-Chieh Chienhas ("Chienhas") has served as UMC's Co-President since June 14, 2017 and is a Director of the Company.

21.     Defendant Jason Wang ("Wang") has served as UMC's Co-president since June 14, 2017 and is a Director of the Company.

22.     Defendant Po-Wen Yen ("Yen") served as UMC's Chief Executive Officer ("CEO") from November 19, 2012 until June 14, 2017.

23.     Defendant Chitung Liu ("Liu") has served as UMC's Chief Financial Officer at all relevant times.

24.     The Defendants referenced above in ¶¶ 20-23 are sometimes referred to herein collectively as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of UMC's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of UMC's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with UMC, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     UMC was founded in 1980 and is headquartered in Hsinchu City, Taiwan.   UMC provides semiconductor wafer foundry solutions.   Through its two business segments, Wafer Fabrication and New Business, UMC provides circuit design, mask tooling, wafer fabrication, and assembly and testing services.   UMC also purports to engage in the research, development, and manufacture of products in the solar energy and light-emitting diode industries.   It serves fabless design companies, and integrated device manufacturers.   UMC operates primarily in Taiwan, Singapore, China, Japan, Europe, and the United States.

27.     On May 13, 2016, the Company announced that it had entered into a DRAM Technology Cooperation Agreement with Fujian. Under the agreement, Fujian was to provide

UMC with related equipment for its research and development, as well as service fees subject to the progress of the technology development. UMS was to develop DRAM related technologies for Fujian and deliver such development results to Fujian before May 12, 2021. The developed technologies were to be jointly owned by both parties.

28.     Fujian was established in early 2016 in the Fujian Province of China for the sole purpose of designing, developing, and manufacturing DRAM.  Fujian was founded with a $5.65 billion investment provided by the PRC and related entities, and the company's two major shareholders were PRC state-owned enterprises.

29.     DRAM is a memory device product used in electronics to store information. DRAM is a technologically advanced commodity that is widely used in digital electronics, as well as leading-edge computing, consumer, networking, automotive, industrial, embedded, and mobile productions.

30.     At all relevant times, one of UMC's primary competitors has been Micron, a leading U.S. semiconductor company known for its DRAM products.

**Materially False and Misleading Statements Issued During the Class Period**

31.     The Class Period begins on October 28, 2015, when the Company issued a press release announcing its financial and operating results for the third quarter of 2015 (the "Q3'15 PR").  Despite entering into an undisclosed illegal conspiracy with Fujian and Chen to steal Micron's DRAM technology for their own development in October 2015, UMC nevertheless reported in the Q3'15 PR research and development expenses of NT $3.139 million for three-month period ended September 20, 2015.  The financial results reported in the Q3'15 PR were filed with the SEC as Exhibit 99.1 to the Form 6-K dated November 13, 2015.

32.     Also on October 28, 2015. Defendant Yen touted the Company's "innovations" in the integrated circuit ("IC") industry on an earnings call with analysts, stating in relevant part: "Going forward, UMC will continue to drive process innovations across leading edge and legacy technologies, as well as proactively expanding worldwide manufacturing services to support our growth in the IC industry."

33.     On April 18, 2016, UMC filed its annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 20-F").   For 2015, UMC reported net income of NT$12.64 billion, or NT$5.10 per diluted ADS, on net operating revenues of NT$144.83 billion, compared to a net income of NT$10.45 billion, or NT$4.44 per diluted ADS, on net operating revenues of NT$140.01 billion for 2014.   Additionally, UMC reported research and development expenses totaling NT$12.17 billion for 2015, compared to NT$13.66 billion for 2014.

34.     The 2015 20-F contained merely generic, boilerplate representations regarding UMC's risks related to the violation of intellectual property laws, including trade secrets, stating in relevant part:

> Our ability to compete successfully also depends on our ability to operate without infringing on the proprietary rights of others. We have no means of knowing what patent applications have been filed in the United States or in certain other countries until months after they are filed. The semiconductor industry, because of the complexity of the technology used and the multitude of patents, copyrights and other overlapping intellectual property rights, is characterized by frequent litigation regarding patent, trade secret and other intellectual property rights. It is common for patent owners to assert their patents against semiconductor manufacturers. We have received from time to time communications from third parties asserting patents that cover certain of our technologies and alleging infringement of intellectual property rights of others, and we expect to continue to receive such communications in the future . . . . In the event any third party was to make a valid claim against us or against our customers, we could be required to:
>
> - seek to acquire licenses to the infringed technology which may not be available on commercially reasonable terms, if at all;

- discontinue using certain process technologies, which could cause us to stop manufacturing certain semiconductors;
- pay substantial monetary damages; and/or
- seek to develop non-infringing technologies, which may not be feasible.

Any one of these developments could place substantial financial and administrative burdens on us and hinder our business. Litigation, which could result in substantial expenses for us and diversion of our resources, may also be necessary . . . to defend us or our customers against claimed infringement of the rights of others. If we fail to obtain necessary licenses or if litigation relating to patent infringement or other intellectual property matters occurs, it could hurt our reputation as a technology leader in our industry and prevent us from manufacturing particular products or applying particular technologies, which could reduce opportunities to generate revenues.

35.     The 2015 20-F also noted that UMC took "reasonable precautions" to protect against the disclosure of confidential information received from employees, while providing merely generic, boilerplate representations regarding UMC's risks relating to those very issues, stating in relevant part:

In addition, in the course of our operations, we receive confidential information from and about our customers, vendors, partners and employees. Although we take what we believe are reasonable precautions to protect such information from disclosure to [sic] or interruption, there are no guarantees our precautions will prevent accidental or malicious access to such information. In the event of such access, our reputation could be adversely affected, customers and others may hesitate to entrust us with their confidential information, which would negatively affect our operations, and we would incur costs to remedy the breach.

36.     Additionally, the 2015 20-F touted UMC's purported commitment to research and development, including its 2015 allocation of funds and personnel for such purposes, stating, in relevant part:

**Research and Development**

In 2013, 2014 and 2015, we spent NT\$12,493 million, NT\$13,664 million and NT\$12,175 million (US\$371 million), respectively, on research and development, which represented 10.1%, 9.8% and 8.4%, respectively, of our net operating revenues of such years. Our research and development efforts mainly focus on delivering [System-on-Chip ('SoC')] foundry solutions that consist of the world's

leading process technologies, customer support services and manufacturing techniques. These resources provide our foundry customers with improved opportunities to develop SoC products that supply the global market. Our commitment to research and development can be illustrated by our 2015 research and development expenditures, which reached approximately 8.4% of net operating revenues. In June 2007, we completed the construction of a research and development center for nanometer technologies in the Tainan Science Park. The research and development center allows for seamless application of advanced process technology in the research and development phase to the manufacturing phase.

As of March 31, 2016, we employed 1,597 professionals in our research and development activities. In addition, other management and operational personnel are also involved in research and development activities but are not separately identified as research and development professionals.

37.    The 2015 20-F discussed UMC's current research and development strategy in detail, stating, in relevant part:

***Maintain Our Leading Position in Mass-Producible Semiconductor Technology and Selectively Pursue Strategic Investments in New Technologies***. We believe that maintaining and enhancing our leadership in mass-producible semiconductor manufacturing technology is critical to attract and retain customers. Our reputation for technological excellence has attracted both established and emerging leaders in the semiconductor industries who work closely with us on technology development. In addition, we believe our superior processing expertise has enabled us to provide flexible production schedules to meet our customers' particular needs. We plan to continue enhancing capital expenditures in research and development and building internal research and development expertise, to focus on process development and to establish alliances with leading and specialty semiconductor companies to accelerate access to next-generation and specialized technologies. . . . We believe our progress in developing more advanced process technologies has benefited our customers in the fields of computers, communications, consumer electronics and others with special preferences in certain aspects of the products, such as the ultimate performance, density and power consumption.

Moreover, we expect to strengthen our leading position and increase our market share by licensing our technologies to several corporate partners . . . . We will continue to explore licensing opportunities based on UMC's comprehensive technology offerings to further drive our revenue . . . . We believe that such strategy enables us to take advantage of our established research and development capabilities while expanding our footprint globally in a cost-effective manner.

38.     With regard to UMC's competition in the market and comparative research and

development capabilities, the 2015 20-F stated, in relevant part:

**Competition**

The worldwide semiconductor foundry industry is highly competitive, particularly during periods of overcapacity and inventory correction. We compete internationally and domestically with dedicated foundry service providers as well as with integrated device manufacturers and final product manufacturers which have in-house manufacturing capacity or foundry operations. Some of our competitors have substantially greater production, financial, research and development and marketing resources than we have. As a result, these companies may be able to compete more aggressively over a longer period of time than we can. In addition, several new dedicated foundries have commenced operations and compete directly with us. Any significant increase in competition may erode our profit margins and weaken our earnings.

We believe that our primary competitors in the foundry services market are Taiwan Semiconductor Manufacturing Company Limited, Semiconductor Manufacturing International (Shanghai) Corporation and Globalfoundries Inc., as well as the foundry operation services of some integrated device manufacturers such as IBM, Samsung, Intel and Toshiba. Other competitors such as DongbuAnam Semiconductor, Grace Semiconductor Manufacturing Corp., X-FAB Semiconductors Foundries AG and Silterra Malaysia Sdn. Bhd. have initiated efforts to develop substantial new foundry capacity, although much of such capacity involves less cost-effective production than the 12-inch fabs for which we possess technical know-how. New entrants in the foundry business are likely to initiate a trend of competitive pricing and create potential overcapacity in legacy technology. The principal elements of competition in the semiconductor foundry industry include technical competence, production speed and cycle time, time-to-market, research and development quality, available capacity, manufacturing yields, customer service and price. ***We believe that we compete favorably with the new competitors on each of these elements, particularly our technical competence and research and development capabilities.***

(Second emphasis added).

39.     With regard to UMC's 2015 expenses and expenditures on its research and

development program, the 2015 20-F stated, in relevant part:

***Research and development expenses***. Our research and development expenses increased by 9.4% from NT$12,493 million in 2013 to NT$13,664 million in 2014. The increase in research and development expenses resulted primarily from an increase of NT$490 million in personnel expenses, NT$460 million in research

expenses for advanced technologies, NT$290 million in depreciation on the equipment used for research and development. Our research and development expenses as a percentage of our net operating revenues decreased from 10.1% in 2013 to 9.8% in 2014.

\* \* \*

**Research, Development, Patents and Licenses, Etc.**

The semiconductor industry is characterized by rapid changes in technology, frequently resulting in obsolescence of process technologies and products. As a result, effective research and development is essential to our success. We invested approximately NT$12,493 million, NT$13,664 million and NT$12,175 million (US$371 million) in 2013, 2014 and 2015, respectively, in research and development, which represented 10.1%, 9.8% and 8.4%, respectively, of net operating revenues for such years. ***We believe that our continuous spending on research and development will help us maintain our position as a technological leader in the foundry industry.*** As of March 31, 2016, we employed 1,597 professionals in our research and development division.

(Emphasis added.)

40. Appended as exhibits to the 2015 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), in which Defendants Yen and Liu certified that the 2015 20-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the "information contained in the [2015 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

41. On April 13, 2017, UMC filed its annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 20-F"). For 2016, UMC reported net income of NT$4.17 billion, or NT$3.33 per diluted ADS, on net operating revenues of NT$147.87 billion, compared to a net income of NT$12.64 billion, or NT$5.10 per diluted ADS, on net operating revenues of NT$144.83 billion for 2015. Additionally, UMC reported research and development expenses totaling NT$13.53 billion for 2016, compared to NT$12.17 billion for 2015.

42.     With respect to UMC's relationship with Fujian, particularly relating to DRAM technologies, the 2016 20-F stated, in relevant part:

> [I]n May 2016, we entered an agreement with Fujian Jin Hua Integrated Circuit Co., or Fujian Jinhua, in connection with the development of DRAM related technologies. Such developed technologies are expected to be jointly owned by both parties and will not be accessible for local chip design companies. We expect the collaboration to thrive on the strength of Taiwan's semiconductor manufacturing technologies to fulfill the potential domestic demands for specialty DRAM in China. We will be in charge of technology development and currently do not intend to enter the DRAM industry or invest in Fujian Jinhua.

43.     The 2016 20-F stated the following regarding UMC's DRAM Technology Cooperation Agreement with Fujian:

> **DRAM Technology Cooperation Agreement, dated May 13, 2016, between Us and Fujian Jinhua**
>
> We entered into a technology cooperation agreement with Fujian Jinhua on May 13, 2016 to jointly develop DRAM related technologies. Under the agreement, Fujian Jinhua will provide us with related equipment for our research and development, as well as service fees subject to the progress of the technology development. We will develop DRAM related technologies for Fujian Jinhua and deliver such development results to Fujian Jinhua before May 12, 2021. These developed technologies will be jointly owned by both parties.

44.     The 2016 20-F also contained statements substantively equivalent to the merely generic, boilerplate representations contained in the 2015 20-F, as quoted in ¶¶ 34-35 above, regarding:  (i) UMC's risks related to the violation of intellectual property laws, including trade secrets; and (ii) UMC's purported "reasonable precautions" to protect against the disclosure of confidential information received from employees, as well as the Company's risks related to such activity.

45.     Additionally, the 2016 20-F touted UMC's commitment to research and development, including its 2016 allocation of funds and personnel for such purposes, stating, in relevant part:

**Research and Development**

In 2014, 2015 and 2016, we spent NT$13,664 million, NT$12,175 million and NT$13,532 million (US$418 million), respectively, on research and development, which represented 9.8%, 8.4% and 9.2%, respectively, of our net operating revenues of such years. Our research and development efforts mainly focus on delivering SoC foundry solutions that consist of the world's leading process technologies, customer support services and manufacturing techniques. These resources provide our foundry customers with improved opportunities to develop SoC products that supply the global market. Our commitment to research and development can be illustrated by our 2016 research and development expenditures, which reached approximately 9.2% of net operating revenues. In June 2007, we completed the construction of a research and development center for nanometer technologies in the Tainan Science Park. The research and development center allows for seamless application of advanced process technology in the research and development phase to the manufacturing phase.

As of December 31, 2016, we employed 1,825 professionals in our research and development activities. In addition, other management and operational personnel are also involved in research and development activities but are not separately identified as research and development professionals.

46.     The 2016 20-F discussed UMC's current research and development strategy in

detail, stating, in relevant part:

*Maintain Our Leading Position in Mass-Producible Semiconductor Technology and Selectively Pursue Strategic Investments in New Technologies*. We believe that maintaining and enhancing our leadership in mass-producible semiconductor manufacturing technology is critical to attract and retain customers. Our reputation for technological excellence has attracted both established and emerging leaders in the semiconductor industries who work closely with us on technology development. In addition, we believe our superior processing expertise has enabled us to provide flexible production schedules to meet our customers' particular needs. We plan to continue enhancing capital expenditures in research and development and building internal research and development expertise, to focus on process development and to establish alliances with leading and specialty semiconductor companies to accelerate access to next-generation and specialized technologies. . . .

Moreover, we expect to strengthen our leading position and increase our market share by licensing our technologies to several corporate partners . . . . We will continue to explore licensing opportunities based on our comprehensive technology offerings to further drive our revenue . . . . In addition, we also recently enhanced our technology platform by collaborating with additional technology parties for the research and development of specialty technologies . . .

14

. We believe that such strategies enable us to take advantage of our established research and development capabilities while expanding our footprint globally in a cost-effective manner.

47.     With regard to UMC's competition in the market and comparative research and development capabilities, the 2016 20-F stated, in relevant part:

**Competition**

The worldwide semiconductor foundry industry is highly competitive, particularly during periods of overcapacity and inventory correction. We compete internationally and domestically with dedicated foundry service providers as well as with integrated device manufacturers and final product manufacturers which have in-house manufacturing capacity or foundry operations. Some of our competitors have substantially greater production, financial, research and development and marketing resources than we have. As a result, these companies may be able to compete more aggressively over a longer period of time than we can. In addition, several new dedicated foundries have commenced operations and compete directly with us. Any significant increase in competition may erode our profit margins and weaken our earnings.

We believe that our primary competitors in the foundry services market are Taiwan Semiconductor Manufacturing Company Limited, Semiconductor Manufacturing International (Shanghai) Corporation and Globalfoundries Inc., as well as the foundry operation services of some integrated device manufacturers such as IBM, Samsung, Intel and Toshiba. Other competitors such as DongbuAnam Semiconductor, Grace Semiconductor Manufacturing Corp., X-FAB Semiconductors Foundries AG and Silterra Malaysia Sdn. Bhd. have initiated efforts to develop substantial new foundry capacity, although much of such capacity involves less cost-effective production than the 12-inch fabs for which we possess technical know-how. New entrants in the foundry business are likely to initiate a trend of competitive pricing and create potential overcapacity in legacy technology. The principal elements of competition in the semiconductor foundry industry include technical competence, production speed and cycle time, time-to-market, research and development quality, available capacity, manufacturing yields, customer service and price. ***We believe that we compete favorably with the new competitors on each of these elements, particularly our technical competence and research and development capabilities.***

(Emphasis added.)

48.     With regard to UMC's 2016 expenses and expenditures on its research and development program, the 2016 20-F stated, in relevant part:

15

Research and development expenses consist primarily of research testing related expenses, salaries and related personnel expenses and depreciation on the equipment used for our research and development.

* * *

**_Research and development expenses_**. Our research and development expenses increased by 11.1% from NT$12,175 million in 2015 to NT$13,532 million (US$418 million) in 2016. The increase in research and development expenses was mainly due to an increase of NT$380 million (US$12 million) in depreciation expenses, NT$225 million (US$7 million) in wafers for research and development usage, NT$211 million (US$7 million) in personnel expenses and NT$190 million (US$6 million) in maintenance expenses. Our research and development expenses as a percentage of our net operating revenues increased from 8.4% in 2015 to 9.2% in 2016.

49.　　Appended as exhibits to the 2016 20-F were signed SOX certifications wherein Defendants Yen and Liu certified that the 2016 20-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the "information contained in the [2016 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.　　On April 26, 2018, UMC filed its annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 20-F").  For 2017, UMC reported net income of NT$6.680 billion, or NT$3.75 per diluted ADS, on net operating revenues of NT$149.29 billion, compared to a net income of NT$4.17 billion, or NT$3.33 per diluted ADS, on net operating revenues of NT$147.87 billion for 2016.  Additionally, UMC reported research and development expenses totaling NT$13.67 billion for 2017, compared to NT$13.53 billion for 2016.

51.　　The 2017 20-F contained substantively equivalent statements as those contained in the 2016 20-F, as quoted in ¶ 43 above, regarding UMC's relationship and DRAM Technology Cooperation Agreement with Fujian.

52.     The 2017 20-F also contained statements substantively equivalent to the merely generic, boilerplate representations contained in the 2015 20-F and 2016 20-F, as quoted in ¶¶ 34-35 above, regarding:  (i) UMC's risks related to the violation of intellectual property laws, including trade secrets; and (ii) UMC's purported "reasonable precautions" to protect against the disclosure of confidential information received from employees, as well as the Company's risks related to such activity.

53.     Additionally, the 2017 20-F touted UMC's commitment to research and development, including its 2017 allocation of funds and personnel for such purposes, stating, in relevant part:

**Research and Development**

In 2015, 2016 and 2017, we spent NT$12,175 million, NT$13,532 million and NT$13,669 million (US$461 million), respectively, on research and development, which represented 8.4%, 9.2% and 9.2%, respectively, of our net operating revenues of such years. Our research and development efforts mainly focus on delivering SoC foundry solutions that consist of the world's leading process technologies, customer support services and manufacturing techniques. These resources provide our foundry customers with improved opportunities to develop SoC products that supply the global market. Our commitment to research and development can be illustrated by our 2017 research and development expenditures, which reached approximately 9.2% of net operating revenues. In June 2007, we completed the construction of a research and development center for nanometer technologies in the Tainan Science Park. The research and development center allows for seamless application of advanced process technology in the research and development phase to the manufacturing phase.

As of December 31, 2017, we employed 1,909 professionals in our research and development activities. In addition, other management and operational personnel are also involved in research and development activities but are not separately identified as research and development professionals.

54.     The 2017 20-F discussed UMC's current research and development strategy in detail, stating, in relevant part:

Enhancing our manufacturing process technologies is critical to our ability to provide services for our customers. ***We intend to continue to advance our***

17

***process technologies through internal research and development and alliances with other companies.*** Although we have an internal research and development team focused on developing new and improved semiconductor manufacturing process technologies, we are also dependent on some of our technology partners to advance certain process technology portfolios. In addition, we currently have patent cross-licensing agreements with several companies, including International Business Machines Corporation, or IBM.

(Emphasis added.)

55.     With regard to UMC's competition in the market and comparative research and development capabilities, the 2017 20-F stated, in relevant part:

**Competition**

The worldwide semiconductor foundry industry is highly competitive, particularly during periods of overcapacity and inventory correction. We compete internationally and domestically with dedicated foundry service providers as well as with integrated device manufacturers and final product manufacturers which have in-house manufacturing capacity or foundry operations. Some of our competitors have substantially greater production, financial, research and development and marketing resources than we have. As a result, these companies may be able to compete more aggressively over a longer period of time than we can. In addition, several new dedicated foundries have commenced operations and compete directly with us. Any significant increase in competition may erode our profit margins and weaken our earnings.

We believe that our primary competitors in the foundry services market are Taiwan Semiconductor Manufacturing Company Limited, Semiconductor Manufacturing International (Shanghai) Corporation and Globalfoundries Inc., as well as the foundry operation services of some integrated device manufacturers such as IBM, Samsung, Intel and Toshiba. Other competitors such as DongbuAnam Semiconductor, Grace Semiconductor Manufacturing Corp., X-FAB Semiconductors Foundries AG and Silterra Malaysia Sdn. Bhd. have initiated efforts to develop substantial new foundry capacity, although much of such capacity involves less cost-effective production than the 12-inch fabs for which we possess technical know-how. New entrants in the foundry business are likely to initiate a trend of competitive pricing and create potential overcapacity in legacy technology. The principal elements of competition in the semiconductor foundry industry include technical competence, production speed and cycle time, time-to-market, research and development quality, available capacity, manufacturing yields, customer service and price. ***We believe that we compete favorably with the new competitors on each of these elements, particularly our technical competence and research and development capabilities.***

18

(Emphasis added).

56.     With regard to UMC's 2017 expenses and expenditures on its research and development program, the 2017 20-F stated, in relevant part:

> Research and development expenses consist primarily of salaries and related personnel expenses, research testing related expenses and depreciation on the equipment used for our research and development.
>
> * * *
>
> **_Research and development expenses._** Our research and development expenses increased by 1.0% from NT$13,532 million in 2016 to NT$13,669 million (US$461 million) in 2017. The increase in research and development expenses was mainly due to an increase of NT$469 million (US$16 million) in personnel expenses, NT$206 million (US$7 million) in depreciation expenses and NT$68 million (US$2 million) in intellectual property royalty expenses. The decrease in research and development expenses was mainly due to a decrease of NT$322 million (US$11 million) in wafers for research and development usage, NT$211 million (US$7 million) in mask expenses and NT$108 million (US$4 million) in indirect material expenses. Our research and development expenses as a percentage of our net operating revenues were both 9.2% in 2016 and 2017.
>
> * * *
>
> **Research, Development, Patents and Licenses, Etc.**
>
> The semiconductor industry is characterized by rapid changes in technology, frequently resulting in obsolescence of process technologies and products. As a result, effective research and development is essential to our success. We invested approximately NT$12,175 million, NT$13,532 million and NT$13,669 million (US$461 million) in 2015, 2016 and 2017, respectively, in research and development, which represented 8.4%, 9.2% and 9.2%, respectively, of net operating revenues for such years. **_We believe that our continuous spending on research and development will help us maintain our position as a technological leader in the foundry industry._** As of December 31, 2017, we employed 1,909 professionals in our research and development division.

(Emphasis added.)

57.     Appended as exhibits to the 2017 20-F were signed SOX certifications wherein Defendants Wang, Chien, and Liu certified that the 2017 20-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the

"information contained in the [2017 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

58.     The statements referenced in ¶¶ 31-57 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) UMC conspired with Fujian to steal trade secrets from Micron relating to its research and development of DRAM; (ii) UMC hired former Micron employees for the purpose of stealing such information from Micron; (iii) the foregoing conduct placed UMC and certain of its employees at an increased risk of criminal and regulatory investigation by the U.S. government; and (iv) as a result, UMC's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

59.     On November 1, 2018, the DOJ indicted UMC, Fujian, and Chen, a former Micron employee hired by UMC, for conspiracy to commit economic espionage, conspiracy to commit theft of trade secrets, and economic espionage (receiving and possessing stolen trade secrets). The indictment stated that the companies conspired to steal trade secrets from Micron relating to its research and development of memory storage devices. According to the indictment, the conspiracy to commit economic espionage began in or about January 2016, the conspiracy to commit theft of trade secrets began in or about October 2015, and the economic espionage (receiving and possessing stolen trade secrets) began in or about February 2016.

60.     According to the Indictment, Chen is a Taiwanese national and former General Manager and Chairman of Rexchip Electronics Corporation ("Rexchip"), which Micron acquired

in or around 2013, becoming MMT.  Chen became the President of MMT and Site Director of

MMT's Fabrication Facility 16, responsible for making Micron's 25nm DRAM chip.  Chen later

resigned from MMT in July 2015 and began working for UMC as its Senior Vice President and

Fabrication Director in Taiwan in September 2015.

61.     As alleged in the indictment, in or around November 2015, Chen hired a former

MMT employee ("Employee 1") to work for UMC.  According to the indictment, Employee 1:

> Prior to leaving MMT . . . ***stole confidential and proprietary materials belonging to Micron, including trade secrets*** pertaining to the prior, current, and future generations of Micron's DRAM technology, including the 80 (30nm), 90 (25nm), 100 (20nm), and 110 (1Xnm) series DRAM. ***While working at UMC, Employee 1 referenced the stolen Micron materials to support UMC's design*** of the F32nm DRAM technology for transfer to Jinhua . . . . ***Employee 1 stored the stolen Micron trade secrets . . . on one or more digital devices belonging to UMC.[1]***

(Emphasis added).

62.     Additionally, Employee 1 "acting as an agent of UMC, communicated with a

current employee of MMT" ("Employee 2").  According to the indictment, Employee 2:

> [P]rovided Employee 1 with confidential and proprietary Micron information to further UMC's F32nm DRAM technology design, including information related to Micron's wafer specifications for its 25nm DRAM chip.

> On April 26, 2016, Employee 2 left MMT's employment. Employee 2 told MMT that he was leaving to work at his family business, and he signed the MMT Declaration of Resignation, declaring and certifying that he did not keep any documents, confidential or otherwise, belonging to the company, and that he destroyed any hard copy or electronic forms in his possession or control that were stored on non-Micron property, including computers, phone, personal email, or file sharing accounts. ***Employee 2 did not leave to work for his family business but rather immediately began working for UMC.***

> ***In the weeks leading up to Employee 2's resignation from MMT, he downloaded over 900 confidential and proprietary files belonging to Micron . . . by downloading the files from Micron servers and transferring them to USB external storage devices*** or uploading the files to his personal Google Cloud account stored on servers in the United States. ***Many of the files were marked***

---

[1] Throughout the indictment Fujian Jianhua Integrated Circuit Co. Ltd. is referred to as "Jinhua" rather than "Fujian".

*"Micron Confidential," "Micron Technology, Inc., Confidential and Proprietary," or "Micron Confidential/Do Not Duplicate."* The created dates in the Google files *metadata showed that Employee 2 accessed Micron confidential and proprietary files both before and after he left Micron employment, and while working at UMC.*

In the weeks leading up to Employee 2's resignation from MMT, Employee 2 ran numerous deletion processes and a CCleaner program on his laptop computer to mask his theft of Micron trade secrets. *He also conducted numerous internet searches*, accessing a number of publicly available news articles about the PRC government's support of the growth of the DRAM business in the PRC, and *specifically on UMC and Jinhua's cooperation toward creating and producing DRAM.*

*While working at UMC, Employee 2 referenced Micron trade secrets to assist and further UMC's development of its F32nm DRAM technology.* In or around July or August 2016, *Employee 2, at the direction of a UMC employee, referenced Micron's Trade Secret . . . and provided critical design rule data to that employee to further UMC's development of its F32nm DRAM technology, knowing that UMC would transfer the technology to Jinhua. Employee 2 used his UMC-assigned laptop to access his Google Drive, download a copy of [the] Trade Secret . . . and reference the data contained therein to assist UMC with its F32nm DRAM design rule. UMC employees were directed to use the information Employee 2 provided to complete UMC's F32nm DRAM design rule. [The] Trade Secret . . . and UMC's F32nm DRAM design rule were stored in Employee 2's Google Drive, and a comparison of the two show Micron's information being used in UMC's F32nm DRAM design rule document.*

(Emphasis added) (paragraph numbers omitted).

63. The indictment detailed how UMC and its employees abused Micron's trade secret information following the unlawful acts of Employee 1 and Employee 2, stating, in relevant part:

On October 23, 2016, Chen, UMC, Jinhua, and government officials from the PRC attended a Jinhua/UMC recruiting fair in the Northern District of California to recruit employees from the United States with semi-conductor experience to work for both companies in either the research and development or sales and marketing division. Chen stated at the recruiting fair that UMC had transferred its 25nm DRAM chip to Jinhua. On or about October 24, 2016, Chen and others from UMC and Jinhua, including the mayors from the PRC cities of Jinjiang and Quanzhou, also visited semiconductor equipment-manufacturing companies Applied Materials, Lam Research, and KLA Tencor, all located in the Northern District of California, to facilitate its DRAM production process. *While at the*

*recruiting fair and visiting the equipment-manufacturing companies in the Northern District of California, Chen, UMC, and Jinhua had obtained and were in continuous control of the stolen Micron trade secrets.*

From in or around September 2016 through March 2017, *UMC and Jinhua filed five patents and a patent application concerning DRAM technology that contained information that was the same or very similar to technology described in Micron's Trade Secrets . . . . Employee 1 was listed as an inventor in each of the five patents and the patent application.* The patents were subsequently jointly issued to UMC and Jinhua. *The information contained in the patents and patent application contained Micron trade secrets that could not be obtained through reverse engineering.*

In February 2017, *Taiwan law enforcement authorities executed search warrants and seized items from UMC's offices and the residences of Employee 1 and 2. They found electronic and hard copy files containing Micron trade secrets in areas and on devices associated with UMC and belonging to Employee 1 and 2. Knowing that Taiwan law enforcement was on its way to execute search warrants at UMC, another UMC employee directed both Employee 1 and 2 to remove any electronic devices they possessed that contained Micron information on them.* Some of the electronic devices that contained Micron information were turned over to Taiwan law enforcement. *At least one electronic device that contained Micron information was not turned over to Taiwan law enforcement and had been concealed by UMC and Chen.*

(Emphasis added) (paragraph numbers omitted).

64.     As the market learned of UMC's indictment, UMC's ADS price fell by $0.19 per share, or nearly 10%, over the following two trading sessions to close at $1.71 per share on November 5, 2018.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired UMC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UMC securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by UMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of UMC;

- whether the Individual Defendants caused UMC to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of UMC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- UMC  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold UMC securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

74.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

75.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UMC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise

acquire UMC securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for UMC securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about UMC's finances and business prospects.

78.     By virtue of their positions at UMC , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of UMC, the Individual Defendants had knowledge of the details of UMC's internal affairs.

80.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of UMC.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to UMC's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of UMC securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning UMC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired UMC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

81.     During the Class Period, UMC securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of UMC securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of UMC securities was substantially lower than the prices paid by Plaintiff and the

other members of the Class.  The market price of UMC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

84.     Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.     During the Class Period, the Individual Defendants participated in the operation and management of UMC, and conducted and participated, directly and indirectly, in the conduct of UMC's business affairs.  Because of their senior positions, they knew the adverse non-public information about UMC's false financial statements.

86.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to UMC's financial condition and results of operations, and to correct promptly any public statements issued by UMC which had become materially false or misleading.

87.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which UMC disseminated in the marketplace during the Class Period concerning UMC's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause UMC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of UMC within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of UMC securities.

88.     Each of the Individual Defendants, therefore, acted as a controlling person of UMC.  By reason of their senior management positions and/or being directors of UMC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, UMC to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of UMC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by UMC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 14, 2019                                     Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan D. Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
           ahood@pomlaw.com
           jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1.    I,  _____Kevin D. Meyer_____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against United Microelectronics Corporation ("United

Microelectronics" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire United Microelectronics securities at the direction of plaintiffs

counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired United Microelectronics securities during the class period, including providing testimony at

deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead

plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in United

Microelectronics securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____
                          (Date)


_____
(Signature)

_____
(Type or Print Name)

**United Microelectronics Corporation (UMC)**                                    **Meyer, Kevin D.**

**List of Purchases and Sales**

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 6/12/2018 | Purchase | 200 | $2.9000 |