## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN D. MEYER, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED MICROELECTRONICS CORPORATION, SHAN-CHIEH CHIEN, JASON WANG, PO-WEN YEN, and CHITUNG LIU,<br><br>        Defendants. | No. 19-cv-02304-VM<br><br>CLASS ACTION |

### DECLARATION OF GREGORY M. NESPOLE IN SUPPORT OF (i) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (ii) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND  EXPENSES AND INCENTIVE AWARD TO LEAD PLAINTIFF

I, Gregory M. Nespole, hereby declare as follows:

1.        I am a partner of the law firm of Levi & Korsinsky, LLP ("**Levi & Korsinsky**" or "**Lead Counsel**"), attorneys for Lead Plaintiff Mark Nelson ("**Lead Plaintiff**") in the above-captioned securities class action ("**Action**"). I am admitted to practice before this Court and have personal knowledge of the various matters set forth herein based on my day-to-day participation in the prosecution and settlement of this Action.

2.        I submit this Declaration in support of (i) Lead Plaintiff's motion for Final Approval of Class Action Settlement and Plan of Allocation, and (ii) Lead Counsel's motion for an Award of Attorneys' Fees and Expenses and Incentive Award to Lead Plaintiff. Both motions have the full support of Lead Plaintiff as set forth in the accompanying Declaration of Mark Nelson. A compendium of unreported "slip opinions" cited in these motions is attached hereto in alphabetical order as **Exhibit A**.

3.      Unless otherwise defined, capitalized terms in this Declaration have the same meaning as in the Stipulation of Settlement dated June 30, 2020 and filed on July 27, 2020 (ECF 55-1, the "**Stipulation**"). I respectfully refer the Court to my previous Declaration in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement dated and filed on July 27, 2020 (ECF 55), which I affirm and incorporate by reference.

### Preliminary Statement

4.      The proposed Settlement now before the Court provides for the full resolution of the federal securities fraud claims against United Microelectronics Corporation ("**UMC**" or the "**Company**") and Shan-Chieh Chien, Jason Wang, Po-Wen Yen, and Chitung Liu (the "**Individual Defendants**," and together with UMC, the "**Defendants**") in this Action,  in exchange for a cash payment of $3,000,000. As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class in light of the significant risks of continuing to litigate this Action.

5.      Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and the defenses to the claims. In choosing to settle, Lead Plaintiff and Lead Counsel took into consideration the substantial risks associated with advancing the claims alleged in the Action, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.

6.      Specifically, Defendants would have likely argued that Lead Plaintiff failed to state a claim under Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. Defendants likely would have argued that Lead Plaintiff did not allege with particularity that the Individual Defendants had contemporaneous knowledge demonstrating the falsity of the statements at issue, *i.e.,* scienter; that Lead Plaintiff would be unable to

demonstrate loss causation; and the market for the Company's American Depositary Shares ("**ADSs**") was inefficient because they traded mostly in Asia and sparingly in the United States.

7.     Even if Lead Plaintiff overcame these substantial hurdles on a motion to dismiss, prosecuting this Action through discovery would have been unusually challenging, expensive and time consuming because most, if not all, of the relevant witnesses, documents and other evidence are in Taiwan and mainland China. There are well known difficulties in compelling testimony and cooperation from witnesses in those countries. Discovery would have been further complicated because Lead Plaintiff likely would have required discovery from individuals who were under indictment both in the United States and Taiwan, thus implicating their Fifth Amendment rights against self-incrimination in the United States and exposing them to the possibility of civil liability. Given the complexity and sophistication of the subject matter, proving the existence and amount of damages would have required a costly and inherently unpredictable battle of the experts addressing intellectual property questions surrounding DRAM (dynamic random access memory) development and what is considered proprietary versus open source technology. Accordingly, in the absence of a settlement, there was a very real risk that the Settlement Class could have recovered nothing or an amount significantly less than the negotiated Settlement of $3 million.

8.     In addition to seeking approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Lead Counsel's financial consultant and the claims administrator, and provides for the distribution of the Net Settlement Fund to Settlement Class members who submit Proof of Claim forms that are approved for payment based on a function of (i) when a Settlement Class

Member purchased the Company's ADSs, and (ii) the daily per share amount of artificial inflation in the price of the Company's ADSs.

9.      With respect to the Fee and Expense Application, as discussed in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Incentive Award to Lead Plaintiff (the "**Fee Brief**"), the requested fee of 30% of the Settlement Fund would be fair both to the Settlement Class and to Lead Counsel, and warrants the Court's approval. This fee request is on par with fee percentages frequently awarded in this type of action and, under the facts of this case, is justified in light of the benefits that Lead Counsel conferred on the Settlement Class, the risks it undertook, the quality of the representation, the nature and extent of the legal services provided, and the fact that Lead Counsel pursued the case at its sole financial risk. Lead Counsel also seeks $22,300.51 in litigation expenses incurred in connection with its work, as well as a $5,000 incentive award to Lead Plaintiff in recognition of his significant assistance in prosecuting the Action.

## History of the Action

10.      On March 14, 2019, Kevin D. Myer filed a securities class action complaint against UMC and certain of its current and former officers and/or directors, on behalf of himself and all persons or entities who purchased or otherwise acquired UMC ADSs between October 28, 2015 and November 1, 2018, inclusive (the "**Class Period**"). The Action, which was assigned to the Honorable Victor Marrero, alleged violations of 15 U.S.C. §§ 78j(b) and 78t(a) ("**Section 10(b)**" and "**Section 20(a)**," respectively) of the Securities Exchange Act of 1934 and 17 C.F.R. §240.10b-5 promulgated thereunder. (ECF No. 1).

11.     On March 14, 2019, pursuant to the Private Securities Litigation Reform Act of 1995, counsel for plaintiff Meyer published notice on *Globe Newswire* informing other potential class members of their right to move for appointment as lead plaintiff for the putative Class.

12.     On May 13, 2019, Mark Nelson moved to be appointed lead plaintiff and moved for his attorneys, Levi & Korsinsky, to be appointed lead counsel. (ECF No. 12). On May 23, 2019, the Court appointed Mr. Nelson as Lead Plaintiff and Levi & Korsinsky as Lead Counsel (ECF No. 19).

13.     From May 23, 2019 to September 27, 2019, Lead Plaintiff, through counsel, diligently investigated the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included analyzing, among other things, publicly filed documents and records, investigative reports, and news stories; and reviewing and corroborating the allegations and developments. In particular, Lead Counsel reviewed, further researched, and took steps to corroborate the information and averments in (a) *United States v. United Microelectronics Corporation, et al.*, No. 18-cr-0465-MMC (N.D. Cal.) (the "**DOJ Criminal Action**"); (b) *United States v. United Microelectronics Corporation, et al.*, No. 3:18-cv-6643-MMC (N.D. Cal.), (c) filings in the Courts of Taiwan, including the Indictment Decision of Taiwan District Prosecutors Office, Case Nos. 106-Zhen-Tzu No. 11035, 4520, 5612, & 5613; and (d) *Micron Technology, Inc. v. United Microelectronics Corporation, et al*., No. 3:17-cv-6932-MMC (N.D. Cal.). In addition, Lead Counsel consulted with certain experts regarding issues of market efficiency and damages suffered by Lead Plaintiff and the Class resulting from the claims in the Action.

14.     Lead Counsel conducted considerable research into the semiconductor industry. That investigation included understanding how RAM (random access memory), a well-known type

of memory so-called because of its ability to access any location in memory with roughly the same time delay, operates in laptops, computers and other devices. Lead Counsel further studied DRAM, a specific type of RAM that allows for higher densities at a lower cost. Lead Counsel also discussed these subjects with Lead Plaintiff, who has relevant professional experience in the field. With that, Lead Counsel learned and investigated how DRAM is often at the center of alleged trade secret violations and subject to highly complex patent litigation. Lead Counsel spent substantial time studying how a DRAM cell is composed of only two components – a transistor and capacitor – and that there was a very fine line between intellectual property theft and building out on open source data when discussing capacitor evolution. Simply stated, Lead Counsel knew from the outset of the litigation that Defendants were going to argue (and they did) that there was no theft of proprietary intellectual property but rather that Defendants permissively built on and advanced open source data to manufacture their own chip. Lead Counsel needed to be sufficiently familiar with the concepts to address these defenses.

15.     On September 27, 2019, based on an extensive investigation and discussions with Lead Plaintiff and Lead Counsel, Lead Plaintiff filed a 120-page Amended Complaint alleging claims pursuant to §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, against the Defendants. (ECF No. 42).

16.     On October 23, 2019, Defendants requested a pre-motion conference to address their anticipated motion to stay the Action pending resolution of the DOJ Criminal Action. (ECF No. 45). On October 30, 2019, the Court denied Defendants' request for a stay. (ECF No. 47).

## The Settlement

17.     Beginning before the filing of the Amended Complaint and after it was filed, the Parties participated in vigorous arm's-length negotiations concerning whether an early stage

resolution was possible considering the risks perceived by both sides. Lead Counsel and Defendants' Counsel discussed the procedural posture of the Action, forthcoming pleadings, and the Parties' initial positions concerning the merits and strength of the allegations and potential defenses. During the months that followed, counsel for the Parties continued to undertake meaningful discussions of their views of the merits, strength, and risks concerning this Action.

18.     Defendants' Counsel and Lead Counsel thereafter explored the possibility of resolving the Action through mediation and in December 2019, the Parties, through their counsel, agreed to retain Jed Melnick, Esq. of JAMS (the "**Mediator**") to help facilitate settlement discussions. In aid of the mediation process, the parties exchanged detailed mediation statements that included preliminary damages calculations.

19.     On February 10, 2020, after a full day of intensive negotiations, the Parties agreed to accept, in principle, the Mediator's recommendation to settle all claims in the Action for $3 million subject to the execution of a customary stipulation and agreement of settlement and related papers and contingent on certain Confirmatory Discovery (defined below).

20.     Following the parties' entry into the agreement in principle on February 10, 2020, the Parties negotiated the Stipulation. The Stipulation, which sets forth the final terms and conditions of the Settlement, includes, among other things, a release of all claims asserted against Defendants in the Action in return for a cash payment by Defendants in the amount of $3 million into a Settlement Fund for the benefit of the Settlement Class. The Stipulation was subject to the satisfactory completion of confirmatory discovery.

21.     Following the parties' entry into the Stipulation, UMC provided Lead Plaintiff and Lead Counsel with documents previously produced by UMC in connection with litigation commenced by non-party Micron Technology, Inc., ("**Micron**") including motions to dismiss and

jurisdictional discovery (the "**Confirmatory Discovery**"). Lead Counsel having reviewed the Confirmatory Discovery and apprised Lead Plaintiff of its contents, Lead Counsel and Lead Plaintiff believe that such production constitutes sufficient discovery to evaluate the fairness, reasonableness and adequacy of the Settlement.

22.     In light of the significant risks of proceeding with further litigation, including the risks that Defendants could be successful in dismissing the action premised on damages, causation and market efficiency issues, uncertainty surrounding the collection of a judgment, and having reviewed the Confirmatory Discovery, Lead Plaintiff and Lead Counsel determined that the proposed Settlement represents the best possible result for the Settlement Class. Accordingly, Lead Plaintiff moved for preliminary approval of the contemplated Settlement on July 27, 2020 (ECF 53 – 56) and the Court subsequently issued its Order for Hearing and Notice Directing: (A) Issuance of Notice of Proposed Class Action Settlement; and (B) Setting Date for Final Settlement Fairness Hearing (ECF 57, the "**Preliminary Approval Order**").

23.     Following entry of the Preliminary Approval Order, on October 28, 2020 it was announced by the U.S. Department of Justice that the Company pleaded guilty in the DOJ Criminal Action to one count of trade secret theft. As part of the plea agreement, the Company will pay a $60 million fine and be subject to a three-year term of non-supervised probation. The DOJ agreed to dismiss the related civil case against the Company. According to news reports, the Company maintains that it was unaware of and did not authorize actions taken by the individual defendants in the DOJ Criminal Action.

24.     The docket to Micron's above-referenced civil suit against UMC in the United States District Court for the Northern District of California reflects that the case remains stayed

and that there have been no material developments subsequent to entry of the Preliminary Approval Order in this case.

### Risks of Continued Litigation

25.     Based on their experience and close knowledge of the facts of the case and law governing the claims, Lead Counsel determined that settlement at this juncture is in the best interests of the Settlement Class. As described herein, at the time the Settlement was reached, there were sizable risks facing Lead Plaintiff with respect to pleading and establishing liability, loss causation, market efficiency and damages. Further, there were significant concerns relating to the complexity of the debate inherent in a securities action, rendering explanation to a potential jury difficult. Given the fact that the Company was under indictment in the United States and Taiwan and a defendant in a multi-billion theft of trade secrets case commenced by Micron, Lead Plaintiff had well founded concerns about the Company's long-term ability to satisfy a potential judgment after years of protracted litigation.

### A.     Risks Related to Liability

26.     Lead Plaintiff anticipated that in any motion to dismiss, and during continued litigation, Defendants would have strenuously maintained, among other things, that: (i) Lead Plaintiff did not plead scienter with particularity or plead particularized allegations that the Individual Defendants had contemporaneous knowledge of the falsity of the statements at issue, which results in no knowledge being imputed to the Company; (ii) Lead Plaintiff did not plead that any of the Individual Defendants personally benefitted from the alleged fraud, such as by selling their own shares at a profit; and (iii) Lead Plaintiff did not plead any actionable misstatement or omission because the alleged misstatements are protected statements of corporate puffery and optimism. If Defendants were successful on any of these grounds, the case could have been

dismissed outright or the claims ultimately presented to a jury could have been substantially narrowed. Lengthy appeals, even if Lead Plaintiff were to have prevailed after summary judgment and trial, could have ensued, with no certainty of any recovery for the Settlement Class.

**B.     Risks Concerning Loss Causation, Damages, and Market Efficiency**

27.     Even if Lead Plaintiff overcame the above risks at a motion to dismiss stage, Lead Plaintiff faced serious risks in ultimately proving loss causation and damages at trial. Indeed, if Lead Plaintiff did not meet his burden to establish causation by a preponderance of evidence, then the class would have recovered nothing. As to loss causation, Lead Plaintiff anticipates that Defendants would have argued that the material allegation in the 2018 federal indictment of the Company (that UMC stole trade secrets from Micron to develop DRAM) was previously disclosed in Micron's suit against the Company and a previous indictment of the Company in Taiwan over a year earlier. Defendants would have also likely argued that any damages to the Class were *de minimis*, because, among other things, the price of the Company's ADSs actually increased after the 2018 federal indictment was made public and that any decrease in the price of the Company's ADSs was attributable to factors unrelated to the allegations in the Amended Complaint, such as unprecedented international trade tensions between China and the United States. Defendants also would have likely argued that any damages would have been even further limited by issues of market efficiency since news affecting the prices of the ADSs that is released in Asia would not reach the United States until many hours (and in some instances days) later. If these arguments prevailed, recoverable damages would likely have been substantially reduced.

28.     Issues surrounding market efficiency, namely whether UMC ADSs traded within the United States in an efficient market, presented a notably substantial hurdle. Defendants were likely to argue that the Class could not avail itself of the "fraud-on-the-market" theory to establish

reliance at the motion to dismiss stage or at class certification. This argument presented real risks because, as stated above, there was market price evidence that the trading patterns of UMC ADSs were at times inconsistent with the public information released concerning the Company's legal problems and earnings. This may have been a function of the time delay between news being released in Asia and then being reflected in the market price of UMC ADSs at a subsequent time. For example, news released at 4:00 pm on Friday in Taiwan would be seen at 3:00 am in New York. Accordingly, given translation issues and that analysts covering UMC with access to members of senior management were in both the US and Asia, that information would likely not be fully understood until sometime the following Monday – after UMC had already traded in Asia earlier that day. Indeed, the fact that the trading price of UMC ADSs in Asia increased on news of the indictment would render the question of reliance highly problematic were this Action not settled.

29.     As the case continued, the Parties' respective damages experts would strongly disagree with each other's assumptions and their respective methodologies, especially with respect to availability of the fraud-on-the-market presumption. The risk that the Court or a jury would credit Defendants' expert's anticipated damages positions over those of Lead Plaintiff would have considerable consequences in terms of the amount of recovery for the Settlement Class, even assuming liability were proven. More importantly, the protracted litigation necessary to overcome Defendants' arguments on the motion to dismiss, class certification, summary judgment, and trial would be extremely costly and would have depleted available insurance policy coverage.

## C.    Risks in Maintaining Class Certification

30.     Although class certification had not yet been briefed in this case, and class certification is sought at this juncture for the purposes of settlement only, Defendants would

undoubtedly have raised vigorous challenges to class certification, and such disputes could well devolve into yet another battle of the experts. Additionally, class certification can be reviewed and modified at any time by the Court before final judgment. Although Lead Counsel believes there are strong grounds for certifying a litigation class, discussed in the Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF 56) at Point II, the Settlement avoids any uncertainty with respect to class certification and risks of maintaining certification of the Settlement Class through trial and on appeal. Specifically, class certification faced the reliance and causation defenses discussed herein.

### Lead Plaintiff's Compliance with Preliminary Approval Order and Reaction of the Settlement Class to Date

31. Pursuant to the Preliminary Approval Order, the Court approved the appointment of Analytics Consulting, LLC ("**Analytics Consulting**") as Claims Administrator in the Action and instructed Analytics Consulting to disseminate copies of the Notice and Proof of Claim by first class mail; to publish the Postcard Notice on a national wire service; and to post the Stipulation, Notice, Postcard Notice and Proof of Claim form on the Claim Administrator's website.

32. The Notice and Postcard Notice (respectively attached to the Stipulation as Exhibits A-1 and A-2 thereto, *see* ECF 55-1) provide potential Settlement Class members with information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation for calculating claims; (iii) an explanation of Settlement Class members' right to participate in the Settlement; (iv) an explanation of Settlement Class members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Proof of Claim form in order to be eligible for a payment from the net proceeds

of the Settlement. The Notice also informs Settlement Class members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $75,000. The Notice also informs the Settlement Class that Lead Plaintiff may seek an award for his time and expenses incurred in representing the Class (*i.e.,* an incentive award).

33.     As set forth in the accompanying Declaration of Kari L. Schmidt Regarding Class Notice and Report on Requests for Exclusion Received (the "**Schmidt Decl.**"), Analytics Consulting has complied with its obligations pursuant to the Preliminary Approval Order by mailing the Notice and Proof of Claim to the Company's stockholders of record as well as persons identified by the Company's transfer agent as well as banks, brokerage firms and other third party nominees as possible Settlement Class members. Schmidt Decl. ¶¶ 3-9. As set forth in the Schmidt Decl. ¶¶ 9-10, as of December 1, 2020, Analytics Consulting has mailed these materials to 18,275 potential Settlement Class members and published the Postcard Notice via PR Newswire, a national wire service. Analytics Consulting also maintains and posts information regarding the Settlement on its website, www.umcsecuritieslitigation.com, to provide Settlement Class members with information concerning the Settlement, as well as downloadable copies of the Notice, Proof of Claim, the Stipulation, among other important documents. *Id.* ¶ 11.

34.     Pursuant to ¶¶ 11-12 of the Preliminary Approval Order, the deadline for Settlement Class members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is December 16, 2020. As set forth in the Schmidt Decl. at ¶¶ 13-14, no requests for exclusion and no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received. Should

any objections or requests for exclusion be received, Lead Counsel will address them in reply papers.

<strong><u>The Plan of Allocation for Distribution of Settlement Payments</u></strong>

35.     Pursuant to ¶ 10(a) of the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim form, including all required information, postmarked no later than January 8, 2021. As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and all applicable taxes, the balance of the Settlement Fund (the "**Net Settlement Fund**") will be distributed according to the plan of allocation approved by the Court (the "**Plan of Allocation**").

36.     The proposed Plan of Allocation, which is set forth in full in the Notice (Exhibit A-1 to the Stipulation, ECF 55-1), was designed to achieve an equitable and rational distribution of the Net Settlement Fund. Lead Counsel developed the Plan of Allocation with the assistance of its financial consultant and the Claims Administrator and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

37.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants based on a function of (i) when a Settlement Class member purchased and/or sold the Company's ADSs, (ii) whether the ADSs were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and (iii) the per share amount of artificial inflation in the price of the Company's ADSs. Purchases of the Company's ADSs fall into four periods corresponding to the dates of the alleged fraudulent statements. Within each period, Authorized Claimants are treated on a *pro rata* basis based on their Recognized Claim, as such term is defined in the Notice,

calculated according to the formulas in the Plan of Allocation, which are consistent with Lead Plaintiff's theory of liability and alleged damages. These formulas consider the amount of alleged artificial inflation in the prices of the Company's ADSs, as estimated by Lead Counsel's financial consultant and the Claims Administrator.

38.     Claimants will be eligible for a payment based on when they purchased or otherwise acquired, held, or sold their ADSs. The Court-approved Claims Administrator, under Lead Counsel's direction, will calculate claimants' Recognized Claim using the transactional information provided in their Proof of Claim forms. Claims may be submitted to the Claims Administrator through the mail or online using the settlement website. Neither the Parties nor the Claims Administrator independently have claimants' transactional information. Lead Plaintiff's losses will be calculated in the same manner.

39.     Once the Claims Administrator has processed all submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payment distributions will be made to eligible Authorized Claimants using checks. After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of distribution of the Settlement Fund, the Claims Administrator will, if logistically feasible and economically justifiable, make a further distribution of such balance among Authorized Claimants in an equitable fashion. After any reallocation, or if a reallocation is not undertaken, any balance that remains in the Settlement Fund shall be donated to The Legal Aid Society of New York, a non-sectarian, §50l(c)(3) non-profit organization.

40.     There have been no objections to the Plan of Allocation to date. Schmidt Decl. ¶ 13.

41.     In sum, the proposed Plan of Allocation, developed in consultation with Lead

Counsel's financial consultant and the Claims Administrator,, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

### Lead Counsel's Application for Attorneys' Fees and Expenses

42.     Consistent with the Notice to the Settlement Class, Lead Counsel, on behalf of itself, seeks a fee award of 30% of the Settlement Fund, or $900,000. No other attorneys will share the awarded attorneys' fees. Lead Counsel also requests payment of litigation expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $22,300.51. Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

**A.     Lead Plaintiff Supports the Fee and Expense Application**

43.     As set forth in the accompanying Declaration of Mark Nelson, Lead Plaintiff has evaluated and fully supports the fee and expense application. In coming to this conclusion, Lead Plaintiff – who was involved throughout the prosecution of the Action and negotiation of the Settlement – considered the recovery obtained as well as Lead Counsel's efficient prosecution of the claims to obtain a favorable recovery. *Id.*

**B.     The Time and Labor of Lead Counsel**

44.     The investigation, prosecution, and settlement of the claims asserted in the Action required diligent efforts on the part of Lead Counsel. The many tasks undertaken by Lead Counsel in this case are detailed above.

45.     Among other efforts, Lead Counsel conducted a comprehensive investigation in connection with the preparation of the Amended Complaint and engaged in a vigorous settlement

process with experienced defense counsel. At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.

46.     The following table summarizes Lead Counsel's time records. The table reports the amount of time spent by Lead Plaintiff's attorneys and professional support staff and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates. These figures were prepared from daily time records regularly prepared and maintained by Lead Counsel, which are available at the request of the Court, and reflect time from inception of this action through and including briefing the motion for preliminary approval, and underline excluding time spent on the motion for final approval, the fee application, responding to any objections, preparing for and appearing at the final Settlement Fairness Hearing, and other miscellaneous tasks subsequent to the briefing of the motion for preliminary approval:

| Name | Status | Hourly Rate | Hours | Lodestar |
|------|--------|-------------|-------|----------|
| Joseph Levi | Partner | $ 1,050.00 | 28.50 | $   29,925.00 |
| Gregory Nespole | Partner | $ 1,000.00 | 227.90 | $ 227,900.00 |
| Shannon Hopkins | Partner | $ 1,000.00 | 4.25 | $     4,250.00 |
| Daniel Tepper | Partner | $    975.00 | 51.70 | $   50,407.50 |
| Christopher Kupka | Associate | $    650.00 | 271.50 | $ 176,475.00 |
| Mark Levine | Associate | $    450.00 | 5.40 | $     2,430.00 |
| Zac Gazzard | Paralegal | $    375.00 | 4.75 | $     1,781.25 |
| Karolina Campbell | Law Clerk | $    350.00 | 8.25 | $     2,887.50 |
| Alex Pun | Paralegal | $    325.00 | 23.00 | $     7,475.00 |
| Samantha Halliday | Paralegal | $    325.00 | 2.25 | $        731.25 |
| Jenn Tash | Paralegal | $    325.00 | 4.35 | $     1,413.75 |
| Anu Akinwunmi | Law Clerk | $    300.00 | 17.00 | $     5,100.00 |
|  |  | **TOTAL:** | **650.20** | **$ 510,776.25** |

47.     The hourly rates of Lead Counsel here range from $975-1,050 for partners, $450-650 for associates, and $300-375 for law clerks and professional staff. I respectfully submit that

the hourly rates for attorneys and professional support staff included in this table are reasonable and customary within the securities class action bar.

48.     Lead Counsel has all together expended over 650 hours prosecuting the Action. The resulting collective lodestar is $510,776.25. The requested fee of 30% of the Settlement Fund ($900,000) results in a modest 1.76 multiplier.

## C.     The Standing and Expertise of Lead Counsel

49.     The experience and expertise of Levi & Korsinsky's attorneys is described in the firm resume attached as **Exhibit B** hereto. As set forth therein, the firm has served as lead counsel in a number of high-profile matters and is highly experienced and skilled in securities litigation.

## D.     Standing and Caliber of Opposing Counsel

50.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Here, Defendants were represented by Herrick, Feinstein LLP and Lazare Potter Giacovas & Moyle LLP. These firms are highly skilled and experienced securities attorneys with significant resources. In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

## E.     The Contingency Risk Faced by Lead Counsel

51.     From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average time of several years for these cases to conclude, the

financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Lead Counsel received no compensation during the course of the Action, but incurred more than 650 hours of time for a total lodestar of $510,776.25 and specifically incurred $22,300.51 in out-of-pocket expenses in prosecuting the Action for the benefit of the Settlement Class.

52.     Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

53.     For example, in a theoretical motion to dismiss, federal circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgments dismissals show that even surviving a motion to dismiss is not a guarantee of recovery. Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety. Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. And the path to maintaining a favorable jury verdict can be arduous and time consuming.

54.     As discussed in greater detail above, Lead Plaintiff's success was by no means assured. Defendants would have disputed whether Lead Plaintiff could establish scienter, damages and loss causation. In addition, Defendants would no doubt have contended, as the case proceeded

to summary judgment, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged; indeed, Lead Plaintiff's financial consultant estimated that maximum damages to the Class could be as low as $15 million. Were this Settlement not achieved, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery. Further, prolonged litigation would likely quickly result in the wasting of insurance coverage for the claims.

**F.      Request for Litigation Expenses**

55.      Lead Counsel seeks payment from the Settlement Fund of litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

56.      From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Lead Counsel was motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

57.      The following summary table prepared from Lead Counsel's expense vouchers, check records and other reliable source materials reflects that Lead Counsel's litigation expenses in connection with the prosecution of the Action totaled $22,300.51, excluding routine overhead expenses such as photocopying and telephone calls:

| Category | Total Amount |
|---|---|
| Mediation Fees | $10,379.50 |
| Meals | $216.74 |
| Postage Fees | $19.13 |
| Research Fees | $11,685.14 |
| **TOTAL:** | **$22,300.51** |

58.     Of the total amount of expenses, $10,379.50 or approximately 46% was expended on the Mediator's services which lead to the Parties' agreeing to the proposed Settlement. The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in securities class action litigation, principally electronic research ($11,685.14 or approximately 52%).

## G.     The Reaction of the Settlement Class to the Fee and Expense Application

59.     As mentioned above, consistent with the Preliminary Approval Order, a total of 18,325 Notices have been mailed to potential Settlement Class members, in addition to the publication of the Notice on the Claim Administrator's website. Schmidt Decl. ¶¶ 9, 11. Consistent with the Preliminary Approval Order, the Postcard Notice has been published on a national news wire. *Id.* ¶ 10. These materials inform potential Settlement Class members that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount of approximately $75,000, and that Lead Plaintiff may seek an award for his time and expenses incurred in representing the Class (*i.e.,* an incentive award).[1] While the deadline set by the Court for Settlement Class members to object to the requested fees and expenses has not yet passed, to date no objections have been received, and no class members have opted out. *Id.* ¶¶ 13-14. Lead Counsel will respond to any objections received in reply papers.

## Conclusion

60.     In view of the favorable recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable,

---

[1] Lead Counsel's motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate. In view of the recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submit that a fee in the amount of 30% of the Settlement Fund should be awarded and that litigation expenses in the amount of $22,300.51 be reimbursed in full. In light of Lead Plaintiff's significant assistance in the prosecution of this Action, I respectfully submit that a $5,000 incentive award should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December 2020 in New Rochelle, New York.

/s/ Gregory M. Nespole
Gregory M. Nespole