**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN D. MEYER, Individually and on Behalf of All Others Similarly Situated, <br><br>       Plaintiff, <br><br>       v. <br><br> UNITED MICROELECTRONICS CORPORATION, SHAN-CHIEH CHIEN, JASON WANG, PO-WEN YEN, and CHITUNG LIU, <br><br>       Defendants. | No. 19-cv-02304-VM <br><br> <u>CLASS ACTION</u> <br><br> Hon. Victor Marrero, U.S.D.J. |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION**
**FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**<u>AND PLAN OF ALLOCATION</u>**

LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
(212) 363-7500

*Attorneys for Lead Plaintiff and the Class*

Case 1:19-cv-02304-VM    Document 63    Filed 12/02/20    Page 2 of 31

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT......................................................................................................................4

I.    The Proposed Settlement is Fair, Reasonable, and Adequate, and Warrants Final
Approval ...................................................................................................................4

    A.    The Law Favors and Encourages Settlement of Class Action Litigation ...............4

    B.    The Standards for Final Approval..........................................................................5

    C.    The Settlement Was Reached after Robust Arm's-Length Negotiations, Is
Procedurally Fair, and Is Entitled to a Presumption of Reasonableness.................6

    D.    Application of the Second Circuit's *Grinnell* Factors Supports Approval of
the Settlement as Substantively Fair, Reasonable, and Adequate ..........................7

        1.    The Complexity, Expense, and Likely Duration of the Litigation
Support Approval of the Settlement ...............................................................8

        2.    The Reaction of the Settlement Class to the Settlement...............................9

        3.    The Stage of the Proceedings and the Amount of Information
Available to Counsel Support Approval of the Settlement........................11

        4.    The Risks of Establishing Liability and Damages Support Approval
of the Settlement ........................................................................................12

        5.    The Risks of Maintaining Class Certification............................................15

        6.    The Ability of Defendants to Withstand a Greater Judgment....................16

        7.    The Range of Reasonableness of the Settlement Amount in Light of
the Best Possible Recovery and all the Attendant Risks of Litigation
Support Approval of the Settlement ...........................................................17

    E.    Application of the Factors Identified in the Amendments to Rule 23(e)(2)
Support Approval of the Settlement as Fair, Reasonable, and Adequate ..............19

        1.    Lead Plaintiff and Lead Counsel Have Adequately Represented the
Settlement Class.........................................................................................19

        2.    The Settlement is the Result of Arm's-Length Negotiations.....................19

        3.    The Relief Provided to the Settlement Class is Adequate .........................20

II.     The Plan of Allocation for the Proceeds of the Settlement is Fair and Reasonable
        and Should be Approved.................................................................................................21

III.    Notice to the Class Satisfied the Requirements of Rule 23 and Due Process....................23

CONCLUSION...................................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ............................................................................................. 9

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).......................................................................................... passim

*City of Providence v. Aeropostale Inc. et al.*,
   No. 11 civ. 7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607
   F. App'x. 73 (2d Cir. 2015) ................................................................................................. 7

*Ebbert v. Nassau Cty.*,
   No. CV 05-5445 AKT, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) .................................... 16

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)..................................................................................................... 5

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp.
   PLC*,
   783 F.3d 383 (2d Cir. 2015)................................................................................................. 12

*In re Advanced Battery Techs. Inc. Sec. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................................... 5

*In re Alloy, Inc. Sec. Litig.*,
   No. 03-1597, 2004 WL 2750089 (S.D.N.Y. Dec. 2, 2004) ...................................................... 12

*In re AOL Time Warner Inc.*,
   No. 02 cv 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)................................................... 12

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971,
   2010 WL 5927988 (9th Cir. June 23, 2010) ............................................................................ 9

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012).............................................................................. passim

*In re Citigroup Inc. Sec. Litig.*,
   No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ................................... 5

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007)................................... 7

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
No. MDL 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016) .................................................................................................................. 6, 8

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)................... 8, 9, 22

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ..................................................................................... 23

*In re Gilat Satellite Networks*, *Ltd.*,
No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ............................................ 8

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................. 7, 14, 16

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ............................................................................. 5, 14, 21

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................................ 8, 22

*In re Marsh & McLennan Cos. Sec. Litig.*,
No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)................................... 24

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ..................................................................................... 23

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ..................................................................................... 18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)................................... 18

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................. 18

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)................................ 17, 22

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) ..................................................................................... 19

*In re Telik, Inc. Sec. Litig.,*
576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................................................ 9, 13, 14

*In re Veeco Instruments Inc. Securities Litigation*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)......................................................................... 10

*In re Warner Chilcott Ltd. Sec. Litig.*,
  No. 06 Civ. 11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) .......................................... 11

*Ingles v. Toro*,
  438 F. Supp. 2d 203 (S.D.N.Y. 2006)...................................................................................... 16

*Int'l Bhd of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*,
  No. 3:09-cv-00419, 2012 WL 5199742 (D. Nev. Oct. 19, 2012)............................................ 18

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................................... 11

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)..................................................................................................... 18

*Prasker v. Asia Five Eight LLC*,
  No. 08 Civ. 5811(MGC), 2010 WL 476009 (S.D.N.Y. Jan. 6, 2010) ...................................... 17

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .................................................................................................. 9

*Shapiro v. JPMorgan Chase & Co.*,
  No. 11 Civ. 8331, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014); *accord, In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998)...................................... 7

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003)........................................................................................ 9

*Teachers Ret. Sys. of La. v. A.C.L.N., Ltd.*,
  No. 01-Civ-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)........................... 12, 17

*Thompson v. Metro. Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) .................................................................................................. 7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005)......................................................................................... 4, 5, 6, 23

*White v. First Am. Registry, Inc.*,
  No. 04 Civ. 1611 (LAK), 2007 WL 703926 (S.D.N.Y. Mar. 7, 2007)...................................... 8

**Statutes**

15 U.S.C. § 78u-4(a)(7) ............................................................................................................ 24

**Rules**

Federal Rule of Civil Procedure 23(e) .............................................................................. 5, 16, 24

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Lead Plaintiff Mark Nelson ("**Lead Plaintiff**"), by his undersigned Court-appointed Lead Counsel Levi & Korsinsky, LLP ("**Lead Counsel**"), on behalf of himself and all other members of the proposed Settlement Class,[1] respectfully submits this memorandum of law in support of his motion for final approval of the proposed Settlement of the above-captioned securities class action (the "**Action**"), approval of the proposed plan of allocation for the proceeds of the Settlement (the "**Plan of Allocation**"), and final certification of the Settlement Class.

## PRELIMINARY STATEMENT

As detailed in the Stipulation, Lead Plaintiff and United Microelectronics Corporation ("**UMC**" or the "**Company**") and Shan-Chieh Chien, Jason Wang, Po-Wen Yen, and Chitung Liu (the "**Individual Defendants**," and together with UMC, the "**Defendants**") have agreed to a settlement of the claims in the Action, and the release of all Settled Claims, in exchange for a payment of $3,000,000 in cash (the "**Settlement**") on the terms set forth in the Stipulation. This recovery is a favorable result for the Settlement Class and avoids the substantial risks and expenses of continued litigation, including the risk of recovering less than the amount of the Settlement Fund, or nothing at all.

The Settlement was reached only after Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims. As more fully described

---

[1] Capitalized terms which are not defined in this memorandum have the same meaning as in the Stipulation of Settlement dated June 30, 2020 and filed on July 27, 2020 (ECF 55-1, the "**Stipulation**"). Reference is made to the accompanying Declaration of Gregory M. Nespole (the "**Nespole Declaration**"). The Nespole Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation. The Court is also respectfully referred to the accompanying Declaration of Mark Nelson, the Lead Plaintiff (the "**Nelson Declaration**") in support of this motion.

1

in the accompanying Nespole Declaration at ¶ 13-14, by the time the Settlement was agreed to, Lead Counsel had engaged in a thorough factual investigation of the claims, defenses and underlying events and transactions that are the subject of the Action. This process included analyzing, among other things, publicly filed documents and records, investigative reports, and news stories; and reviewing and corroborating the allegations and developments. In particular, Lead Counsel reviewed, further researched, and took steps to corroborate the information and averments in (a) *United States v. United Microelectronics Corporation, et al.*, No. 18-cr-0465-MMC (N.D. Cal.) (the "**DOJ Criminal Action**"); (b) *United States v. United Microelectronics Corporation, et al.*, No. 3:18-cv-6643-MMC (N.D. Cal.), (c) filings in the Courts of Taiwan, including the Indictment Decision of Taiwan District Prosecutors Office, Case Nos. 106-Zhen-Tzu No. 11035, 4520, 5612, & 5613; and (d) *Micron Technology, Inc. v. United Microelectronics Corporation, et al.*, No. 3:17-cv-6932-MMC (N.D. Cal.) (the "**Micron Action**"). In addition, Lead Counsel consulted with certain experts regarding issues of market efficiency and damages suffered by Lead Plaintiff and the Class resulting from the claims in the Action.

As detailed in in the Nespole Declaration at ¶ 13-14, Lead Counsel conducted considerable research into the semiconductor industry. That investigation included understanding how RAM (random access memory), a well-known type of memory so-called because of its ability to access any location in memory with roughly the same time delay, operates in laptops, computers and other devices. Lead Counsel further studied DRAM, a specific type of RAM that allows for higher densities at a lower cost. With that, Lead Counsel learned and investigated how DRAM is often at the center of alleged trade secret violations and subject to complicated patent litigation. Lead Counsel spent substantial time studying how a DRAM cell is composed of only two components – a transistor and capacitor – and that there was a very fine line between intellectual property

theft and building out on open source data when discussing capacitator evolution. Simply stated, Lead Counsel knew from the outset of the litigation that Defendants were going to argue (and they did) that there was no theft of proprietary intellectual property but rather that UMC permissively advanced open source data to manufacture its own chip. Lead Counsel needed to be sufficiently familiar with the concepts to address these defenses.

The Settlement is the product of extensive arm's-length negotiations between the Parties, which included an in-person mediation session under the auspices of a respected and experienced mediator, Jed Melnick, Esq. of JAMS (the "**Mediator**"). After a full day of intensive negotiation, the Parties agreed, in principle, to a settlement based on the Mediator's recommendation, subject to the execution of a customary stipulation and agreement of settlement and related paper and contingent on certain confirmatory discovery. Nespole Decl. ¶¶ 18-19. In connection with this confirmatory discovery, UMC provided Lead Plaintiff and Lead Counsel with documents it previously produced in the Micron Action as well as motions to dismiss and jurisdictional discovery. *Id.* ¶ 21.

The Settlement is a favorable result in light of the risks of continued litigation. While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants are strong, they recognize that this Action presented a number of substantial risks, especially in light of Defendants' anticipated challenges to several of the elements of a claim under Section 10(b) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and Rule 10b-5 promulgated thereunder, as well as issues of loss causation, damages and market efficiency. *See generally, id.* at ¶¶ 25-29. While Lead Plaintiff would advance credible counter arguments to Defendants' liability defenses, he nonetheless recognizes a substantial risk that Defendants' anticipated motion to dismiss might be granted in part or in full. Even if Defendants' motion to dismiss were

3

unsuccessful, Defendants likely would have continued to press their arguments at summary judgment, at trial, and through appeals. These risks are in addition to the genuine risk of a much smaller recovery, or no recovery at all.

In light of the recovery for the Settlement Class and the risks to continued litigation, as discussed further below and in the Nespole Declaration, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court. *See also* Nelson Decl. at ¶¶ 3-4, 7 (setting forth Lead Plaintiff's support for final approval of the Settlement).

Lead Plaintiff also requests that the Court approve the proposed Plan of Allocation, which was set forth in the Notice sent to Settlement Class members. The Plan of Allocation, which was developed by Lead Counsel with the assistance of its financial consultant and the claims administrator, *see* Nespole Decl. ¶ 8, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class members who submit valid claims. The Plan of Allocation is fair, reasonable, and should likewise be approved.

## ARGUMENT

### I.    The Proposed Settlement is Fair, Reasonable, and Adequate, and Warrants Final Approval

#### A.    The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context.").[2] This policy would be well-served by approval of the Settlement of this

---

[2] All internal quotations and citations are omitted unless otherwise stated.

complex securities class action, that absent resolution, would consume years of this Court's time.

### B.    The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y. 2012).

The standards governing approval of class action settlements are well established in the Second Circuit. In *City of Detroit v. Grinnell Corp*., the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117; *In re Advanced Battery Techs. Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014); *In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).

Additionally, pursuant to the amendments to Rule 23(e)(2) effective December 2018, a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors, most of which overlap with the *Grinnell* factors:

(A)     whether the class representatives and class counsel have adequately represented the class;

(B)     whether the proposal was negotiated at arm's length;

(C)     whether the relief provided for the class is adequate, taking into account:

      i.     the costs, risks, and delay of trial and appeal;

      ii.     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

      iii.     the terms of any proposed ward of attorneys' fees, including timing of payment; and

      iv.     any agreement required to be identified under Rule 23(e)(3); and

(D)     whether the proposal treats class members equitably relative to each other.

For the reasons discussed herein, the proposed Settlement meets the criteria set forth by the Second Circuit and the federal rules.

### C.     The Settlement Was Reached After Robust Arm's-Length Negotiations, is Procedurally Fair, and is Entitled to a Presumption of Reasonableness

A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *Visa*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced Mediator, and an extensive investigation into the claims. As a result, Lead Plaintiff and Lead Counsel had a well-informed basis for assessing the strength of the Settlement Class's claims and Defendants' defenses when they agreed to settle the Action. Their decision to do so was supported by confirmatory discovery.

6

The judgment of Lead Counsel – a law firm that is highly experienced in securities class action litigation, *see* Exhibit B to the Nespole Declaration – that the Settlement is in the best interests of the Settlement Class is entitled to "great weight." *City of Providence v. Aeropostale Inc. et al.*, No. 11 civ. 7132, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015); *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord, In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Moreover, Lead Plaintiff took an active role in supervising this litigation, as envisioned by the PSLRA, and endorses the Settlement. *See* Nelson Decl. ¶¶ 3-4, 7. A settlement reached with the support of an appropriately selected Lead Plaintiff "is entitled to an even greater presumption of reasonableness." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).

Accordingly, the Settlement is entitled to a presumption of reasonableness.

**D.    Application of the Second Circuit's *Grinnell* Factors Supports Approval of the Settlement as Substantively Fair, Reasonable, and Adequate**

The Settlement is also substantively fair, reasonable, and adequate. "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). Additionally, in deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.*,

7

No. 04 Civ. 1611 (LAK), 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007). Here, the Settlement fully satisfies the criteria for approval articulated in *Grinnell*.

> ### 1.      The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature complicated, and district courts in this Circuit have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook,* 2015 WL 6971424, at *3; *Bear Stearns,* 909 F. Supp. 2d at 266; *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010); *In re Gilat Satellite Networks*, *Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception. As discussed in the Nespole Declaration, this case involved complicated and intricate issues related to, among other things, the design and manufacture of DRAM (dynamic random access memory) integrated circuits; market efficiency; securities fraud, and loss causation. Surviving a motion to dismiss, prevailing on summary judgment and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensure) would have been a very complex and risky undertaking that would have required substantial additional time and expense.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Trying this Action would have required extensive expert testimony on numerous contested issues, including falsity, scienter, loss causation and damages, all within the nuanced and esoteric context of integrated circuit design. Expert testimony also would be required about the issue of

market efficiency in the context of thinly-traded American Depositary Shares. Courts routinely observe that these sorts of disputes – requiring dueling testimony from experts – are particularly difficult for plaintiffs to litigate. *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited").

Of course, even if Lead Plaintiff had prevailed at trial, it is virtually certain that appeals would be taken, which would have, at best, substantially delayed any recovery for the Settlement Class. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there is always a risk that the verdict could be reversed by the trial court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *cf. In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court overturned unanimous verdict for plaintiffs, later reinstated by the Ninth Circuit Court of Appeals, and judgment re-entered after denial of *certiorari* by the U.S. Supreme Court).

### 2.      The Reaction of the Settlement Class to the Settlement

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67; *FLAG Telecom*, 2010 WL 4537550, at *16; *In re Veeco Instruments Inc. Securities Litigation*, 2007 WL

4115809, at *7 (S.D.N.Y. Nov. 7, 2007).

Pursuant to the Court's Order for Hearing and Notice Directing: (A) Issuance of Notice of Proposed Class Action Settlement; and (B) Setting Date for Final Settlement Fairness Hearing (ECF 57, the "**Preliminary Approval Order**"), the Court-appointed Claims Administrator, Analytics Consulting LLC ("**Analytics Consulting**"), began mailing copies of the Notice and Proof of Claim form to potential Settlement Class members and beneficial purchasers holding UMC American Depositary Shares ("**ADSs**") in street name on behalf of potential Settlement Class members. *See* the accompanying Declaration of Kari I. Schmidt Regarding Class Notice and Report on Requests for Exclusion Received (the "**Schmidt Decl.**") at ¶¶ 3-5 and Exhibit A thereto. As of December 1, 2020, Analytics Consulting has mailed 18,275 copies of the Notice and Proof of Claim form to potential Settlement Class members. Schmidt Decl. ¶ 9. In addition, on August 28, 2020 Analytics Consulting published the Postcard Notice on the *PR Newswire*, a nationwide wire service. *Id.* ¶ 10. The Notice and other documents are also posted on a website maintained by Analytics Consulting dedicated to this Action (www.UMCSecuritiesLitigation.com) to assist potential Settlement Class members, which will continue to be maintained and updated as appropriate. *Id.* ¶ 11.

The Notice set out the essential terms of the Settlement, Lead Counsel's Fee and Expense Application, and the proposed Plan of Allocation and informed potential Settlement Class members of, among other things, their right to object to any aspect of the Settlement, as well as the procedure for submitting Proof of Claim forms, and for requesting exclusion from the Settlement Class. While the deadline set by the Court for Settlement Class Members to object or request exclusion (December 16, 2020) has not yet passed, to date, no objections or requests for exclusion have been received. Schmidt Decl. ¶¶ 13-14. This further supports granting final

approval of the proposed Settlement. *See, e.g., In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ.

11515, 2009 WL 2025160, at \*2 (S.D.N.Y. July 10, 2009) (no objections by class members

following preliminary approval supports granting final approval). Lead Counsel will respond to

any objections received in reply papers.

### 3.    The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

In considering this factor, "the question is whether the parties had adequate information

about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims,

the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action

for purposes of settlement." *Bear Stearns*, 909 F. Supp. 2d at 267. To satisfy this factor, parties

need not have even engaged in formal or extensive discovery.  *See Maley v. Del Global Techs.*

*Corp.*, 186 F. Supp. 2d 358, 363 (S.D.N.Y. 2002).

As detailed in the Nespole Declaration at ¶¶ 13-14, before filing the Amended Complaint,

Lead Counsel conducted a robust investigation that included, among other things, analyzing

publicly filed documents and records, investigative reports and news reports; reviewing,

researching and corroborating the information and averments in the DOJ Criminal Action, the

accompanying civil action, filings in the Courts of Taiwan and the Micron Action; consulting with

experts regarding issues of market efficiency and damages; and conducting considerable research

into the semiconductor industry and the design and manufacture of DRAM integrated circuits.

Armed with this substantial base of knowledge, Lead Plaintiff was in a position to balance

the proposed settlement amount with a well-educated assessment of the likelihood of overcoming

the risks of litigation. Accordingly, Lead Plaintiff and Lead Counsel respectfully submit that they

had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible

outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-Civ-11814 (MP), 2004 WL

11

1087261, at *3 (S.D.N.Y. May 14, 2004).  The Court thus should find that this factor also supports approval.

### 4. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463.

The principal claims in the Action are based on Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. To establish a claim under the Exchange Act, "a plaintiff must prove: (1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp. PLC*, 783 F.3d 383, 389 (2d Cir. 2015). Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet. *See In re AOL Time Warner Inc.*, No. 02 cv 5575, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) (noting that "[t]he difficulty of establishing liability is a common risk of securities litigation"); *In re Alloy, Inc. Sec. Litig.*, No. 03-1597, 2004 WL 2750089, at *2 (S.D.N.Y. Dec. 2, 2004) (finding that issues present in securities action presented significant hurdles to proving liability).

Here, in particular, Defendants would have vigorously challenged Lead Plaintiff on scienter, damages and loss causation.

### (a) Risks to Proving Liability

The central allegations of the Action are that UMC engaged in an illicit scheme to steal Micron's intellectual property concerning the design of DRAM integrated circuits. In general, the Amended Complaint alleges that Defendants made a number of materially false and misleading

statements and omissions regarding UMC's development of DRAM in violation of Section 10-b Exchange Act and Rule 10b-5 promulgated thereunder. The Amended Complaint further alleges that when the truth regarding DRAM was disclosed to the market via a federal indictment of UMC and the accompanying civil action by the Department of Justice, the price of UMC ADSs declined and thus damaged the Settlement Class. *See generally,* Amended Complaint at ¶¶ 1-22 *et seq.*

Defendants were expected, in their motions to dismiss and beyond, to strongly dispute the existence of falsity and scienter. For example, Defendants were expected to argue, *inter alia*, that: (i) Lead Plaintiff did not plead scienter with particularity or plead particularized allegations that the Individual Defendants had contemporaneous knowledge of the falsity of the statements at issue, which results in no knowledge being imputed to the Company; (ii) Lead Plaintiff did not plead that any of the Individual Defendants personally benefitted from the alleged fraud, such as by selling their own shares at a profit; and (iii) Lead Plaintiff did not plead any actionable misstatement or omission because the alleged misstatements are protected statements of corporate puffery and optimism. *See* Nespole Decl. ¶ 26. Establishing scienter would have been uncertain because "[p]roving a defendant's state of mind is hard in any circumstances." *Telik,* 576 F. Supp. 2d at 579. Even if Lead Plaintiff was successful on the motion to dismiss, many of these same arguments could have been continued at summary judgment, trial, or on appeal, and, in the absence of any settlement, presumably would have been.

Apart from Defendants' arguments, establishing liability would have been further complicated because most, if not all, of the relevant witnesses, documents and other evidence are in Taiwan and mainland China. There are well known difficulties in compelling testimony and cooperation from witnesses in those countries. Nespole Decl. ¶ 7. Moreover, Lead Plaintiff likely would have required discovery from individuals who were under indictment both in the United

States and Taiwan, thus implicating their Fifth Amendment rights against self-incrimination in the United States and exposing them to the possibility of civil liability. *Id.*

### (b) Risks Related to Loss Causation, Damages and Market Efficiency

Even if Defendants' liability were established, loss causation and damages remains a "complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the [shares] 'true' value absent the alleged fraud." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004). In order to resolve most of the disputed issues regarding loss causation and damages, among others, the Parties would have had to rely heavily on expert testimony. *See IMAX*, 283 F.R.D. at 193 ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik,* 576 F. Supp. 2d at 579-80 (in this "'battle of experts', it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury.").

Lead Plaintiff anticipates that Defendants would have strenuously argued, in the motion to dismiss and thereafter, that, *inter alia*: (i) the material allegation in the 2018 federal indictment of the Company (that UMC stole trade secrets from Micron to develop DRAM) was previously disclosed in Micron's suit against the Company and a previous indictment of the Company in Taiwan over a year earlier; (ii) any damages to the Class were *de minimis*, because, among other things, the price of the Company's ADSs actually increased after the 2018 federal indictment was made public and that any decrease in the price of the Company's ADSs was attributable to factors unrelated to the allegations in the Amended Complaint, such as unprecedented international trade

tensions between China and the United States; and (iii) any damages would have been even further limited by issues of market efficiency since news affecting the prices of the ADSs that is released in Asia would not reach the United States until many hours (and in some instances days) later. *See* Nespole Decl. ¶ 27.

Issues surrounding market efficiency, namely whether UMC ADSs traded within the United States in an efficient market, were expected to present a notably substantial hurdle. Defendants were expected to argue, in the motion to dismiss and thereafter, that the Class could not avail itself of the "fraud-on-the-market" theory to establish reliance at the motion to dismiss stage or at class certification. This argument presented real risks because there was market price evidence that the trading patterns of UMC ADSs were at times inconsistent with the public information released concerning the Company's legal problems and earnings. This may have been a function of the time delay between news being released in Asia and then being reflected in the market price of UMC ADSs at a subsequent time. For example, news released at 4:00 pm on Friday in Taiwan would be seen at 3:00 am in New York. Accordingly, given translation issues and that analysts covering UMC with access to members of senior management would need to discuss the release, that information would likely not be fully understood until sometime the following Monday – after UMC had already traded in Asia earlier that day. Indeed, UMC ADSs in fact increased on news of the indictment in Asia, further complicating the issue of reliance. *See* Nespole Decl. ¶ 28.

Given all of these risks with respect to liability, loss causation, damages, and market efficiency, Lead Plaintiff and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### 5.    The Risks of Maintaining Class Certification

Although class certification had not yet been briefed in this case, Defendants would

undoubtedly have raised vigorous challenges to class certification, and such disputes "could well devolve into yet another battle of the experts." *Bear Stearns*, 909 F. Supp. 2d at 268. Additionally, class certification can be reviewed and modified at any time by the Court before final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Although Lead Plaintiff believes there are strong grounds for certifying a litigation class, discussed in the Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 56, the "**Preliminary Approval Brief**") at Point II, the Settlement avoids any uncertainty with respect to class certification and risks of maintaining certification of the Settlement Class through trial and on appeal. *See Ebbert v. Nassau Cty.*, No. CV 05-5445 AKT, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of the certified class supported approval of Settlement); *Ingles v. Toro*, 438 F. Supp. 2d 203, 214 (S.D.N.Y. 2006).[3]

### 6. The Ability of Defendants to Withstand a Greater Judgment

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair. *Grinnell*, 495 F.2d at 463. Defendants' financial condition weighs in favor of final approval of the Settlement. *See, e.g., Global Crossing*, 225 F.R.D. at 460 (ability to withstand a greater judgment supports final approval where the "main settlement funds available to the individuals are the insurance proceeds" which "would be largely consumed by defense costs if this litigation were to continue"); *Teachers' Ret. Sys. of La.,* 2004

---

[3] The Court preliminarily certified the Settlement Class for settlement purposes in the Preliminary Approval Order (ECF 57). There have been no subsequent developments that would undermine that determination and, for all the reasons stated in the Preliminary Approval Brief, incorporated herein by reference, Lead Plaintiff now requests that the Court reiterate its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes, and the appointment of Lead Plaintiff as Class Representative and Levi & Korsinsky, LLP as Class Counsel.

WL 1087261, at *4 (likely depletion of Director and Officer insurance supports settlement approval). In that regard, Lead Plaintiff notes that UMC was a defendant in the DOJ Criminal Action (where it recently pleaded guilty and agreed to pay a $60 million fine), the accompanying civil action by the Department of Justice, and the theft of trade secrets action brought by Micron. Nespole Decl. ¶¶ 13, 23. And even if Lead Plaintiff were to eventually secure a money judgment against UMC, it would need to be domesticated in Taiwan which would involve further delay, expense and uncertainty. In contrast, pursuant to the Stipulation, the $3,000,000 Settlement Fund is deposited into escrow and earning interest. *See Prasker v. Asia Five Eight LLC*, No. 08 Civ. 5811(MGC), 2010 WL 476009, at *5 (S.D.N.Y. Jan. 6, 2010) (approving settlement and noting that "[t]he settlement eliminated the risk of collection by requiring Defendants to pay the Fund into escrow…"). Accordingly, this factor weighs in favor of granting final approval of the Settlement.

### 7.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and all the Attendant Risks of Litigation Support Approval of the Settlement

The last two substantive factors courts consider are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these factors, the issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. The court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462. Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead,

"in any case there is a range of reasonableness with respect to a settlement…." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Lead Counsel and Lead Plaintiff believe that this is a notable settlement once all the variables are considered. First, the $3 million recovery represents a large percentage of the maximum damages that could be achieved given the size of the class. Second, Lead Counsel's financial consultant had estimated that maximum damages could have been as low as $15 million. Nespole Decl. ¶ 54. A $3 million settlement thus represents as much as 20% of the class's possible recovery. This falls well within the range of reasonableness that courts regularly approve in similar circumstances. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving settlement representing approximately 6.25% of estimated damages and noting was at the "higher end of the range of reasonableness of recovery in class actions securities litigation"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *Int'l Bhd of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement recovering 3.5% of maximum damages and noting that the amount is within the median recovery in securities class actions settled in the last few years).

In sum, the *Grinnell* factors support approval of the Settlement.

18

**E.** **Application of the Factors Identified in the Amendments to Rule 23(e)(2) Support Approval of the Settlement as Fair, Reasonable, and Adequate**

The proposed Settlement also meets the criteria set forth in the amendments to Rule 23(e)(2) effective December 2018, most of which are covered by the Second Circuit factors discussed above.

**1.** **Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class**

There can be little doubt that Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.

As set forth in the previously filed motion for preliminary approval of the Settlement and his motion seeking appointment as lead plaintiff, Lead Plaintiff, like all other members of the Settlement Class, acquired UMC ADSs during the Class Period, when their value was allegedly artificially inflated by false and misleading statements. Thus, the claims of the Settlement Class and Lead Plaintiff would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff and all members of the Settlement Class. *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Additionally, throughout the Action, Lead Plaintiff had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. Levi & Korsinsky has a long and successful track record in such cases. *See* **Exhibit B** to the Nespole Decl. (Levi & Korsinsky's firm resume).

**2.** **The Settlement is the Result of Arm's-Length Negotiations**

As discussed above and in the Nespole Declaration at ¶ 18-19, the Settlement was reached after arm's-length negotiations between counsel and overseen by an experienced Mediator. This

factor clearly supports approval of the Settlement.

### 3.    The Relief Provided to the Settlement Class is Adequate

Section (i) of Rule 23(e)(2)(C), whether "the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal," has been explained above.

Rule 23(e)(2)(C)(ii) considers whether the relief is adequate, taking into account the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." As set forth below in Point II, discussing the proposed Plan of Allocation, the proceeds of the Settlement will be distributed to Settlement Class members who submit valid and timely claims. Analytics Consulting (the Claims Administrator) will calculate claimants' Recognized Loss Amounts using the transactional information provided by claimants in their Proof of Claim forms, which can be mailed to the Claims Administrator or submitted online using the settlement website, or, for large investors, with hundreds of transactions, via e-mail to the Claims Administrator's electronic filing team. Because most securities are held in "street name" by the brokers that buy them on behalf of clients, the Claims Administrator, Lead Counsel, and Defendants do not have Settlement Class members' transactional data, and a claims process is required. Because the Settlement does not recover 100% of alleged damages, the Claims Administrator will determine each eligible claimant's *pro rata* share of the Net Settlement Fund (i.e., the "Recognized Claim") based upon each claimant's total "Recognized Loss Amount" compared to the aggregate Recognized Claims of all eligible claimants.

Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, distributions will be made to eligible claimants in the form of checks. After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of initial

distribution, Lead Counsel will, if feasible and economical, re-distribute the balance among eligible claimants who have cashed their checks.  These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute. *See* Stipulation ¶ 8(b). Any balance that still remains in the Net Settlement Fund after any reallocation, or if a reallocation is not undertaken, feasible, or economical, will be contributed to The Legal Aid Society of New York, a non-sectarian, §50l(c)(3) non-profit organization.[4]

The terms of any proposed award of attorneys' fees, including timing of payment (Rule 23(e)(2)(C)(iii)), are discussed in Lead Counsel's accompanying Fee and Expense Application.

Finally, Rule 23(e)(2)(C)(iv) asks the Court to consider the fairness of the proposed Settlement in light of any agreement required to be identified under Rule 23(e)(3). The only agreements made by the Parties in connection with the Settlement are the Stipulation and the confidential Supplemental Agreement concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusion requests as set forth in the Stipulation at ¶ 34. It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class. The Supplemental Agreement can be provided to the Court *in camera* or under seal.

## II.    The Plan of Allocation for the Proceeds of the Settlement is Fair and Reasonable and Should be Approved

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d

---

[4] The Legal Aid Society is a not-for-profit legal aid provider based in New York City. Founded in 1876, it is the oldest and largest provider of legal aid in the United States. *See* www.legalaidnyc.org.

at 270. A plan of allocation with a "rational basis" satisfies this requirement. *FLAG Telecom*, 2010 WL 4537550, at \*21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497. A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision." *PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan of Allocation, which was developed by Lead Counsel with the assistance of its financial consultant and the Claims Administrator, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid Proof of Claim forms. The Plan is set forth in full in the Notice. *See* Exhibit A to the Schmidt Decl. and Exhibit A-1 to the Stipulation. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants based on a function of (i) when a Settlement Class member purchased and/or sold the Company's ADSs, (ii) whether the ADSs were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and (iii) the per share amount of artificial inflation in the price of the Company's ADSs. Purchases of the Company's ADSs fall into four periods corresponding to the dates of the alleged fraudulent statements. Within each period, Authorized Claimants are treated on a *pro rata* basis based on their Recognized Claim, calculated according to the formulas in the Plan of Allocation, which are consistent with Lead Plaintiff's theory of liability and alleged damages. These formulas consider the amount of alleged artificial inflation in the prices of the Company's ADSs, as estimated by Lead Counsel's financial consultant and the Claims Administrator. *See* Nespole Decl. ¶ 37. Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Settlement

Class.

For these reasons, Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (same). Moreover, as noted above, as of December 1, 2020, 18,275 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class members of their right to object to the proposed plan, have been sent to potential Settlement Class members and their nominees and no objections or requests for exclusion have been received. Schmidt Decl. ¶¶ 13-14.

### III.    Notice to the Class Satisfied the Requirements of Rule 23 and Due Process

Lead Plaintiff has provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114. Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.

The Notice provided all of the necessary information for Settlement Class members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the Plan of Allocation. The Notice informed Settlement Class members of, among other things: (1) the amount of the Settlement; (2) the reasons why the Parties are proposing the Settlement; (3) the estimated average recovery per affected share of UMC; (4) the maximum amount of attorneys' fees and expenses that will be sought and the possibility that Lead Plaintiff may seek an award for time and expenses (*i.e.,* an incentive award); (5) the identity and contact information for the

representatives of Lead Counsel who are reasonably available to answer questions from Settlement Class Members concerning matters contained in the Notice; (6) the right of Settlement Class Members to object to the Settlement; (7) the binding effect of a judgment on Settlement Class Members; and (8) the dates and deadlines for certain Settlement-related events. *See* 15 U.S.C. § 78u-4(a)(7). The Notice also contained the Plan of Allocation and provided Settlement Class Members with information about how to submit a Proof of Claim form in order to be eligible to receive a distribution from the Net Settlement Fund.

As of December 1, 2020, Analytics Consulting has mailed 18,275 Notices (including Proof of Claim forms) to potential Settlement Class members or their nominees. Schmidt Decl. ¶ 9; *id.* Exhibit A. Potential Settlement Class members were identified by the Company's transfer agent as well as brokerage firms, banks, institutions and other third-party nominees holding UMC ADSs in street name. *Id.* ¶¶ 4. Notice was also distributed to all custodian banks and broker-dealers via The Depository Trust Company's Legal Electronic Notification System. *Id.* ¶ 6. The Court-approved summary notice was also published on *PR Newswire*, a national wire service. *Id.* ¶ 10. Finally, Analytics Consulting maintains a website dedicated to this Action (www.UMCSecuritiesLitigation.com) to assist potential Settlement Class members containing the Notice, summary notice and other important documents related to the Action and the proposed Settlement. *Id.* ¶ 11.

This combination of individual first-class mail to those who could be identified with reasonable effort, supplemented by notice in an appropriate publication, transmitted over a newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement as fair, reasonable, and adequate; approve the Plan of Allocation as fair, reasonable, and adequate; and grant such other and further relief as the Court deems just and proper. The proposed Final Order and Judgment is attached to the Stipulation as Exhibit B thereto.

Dated: New York, New York
        December 2, 2020                         **LEVI & KORSINSKY, LLP**

                                                  */s/ Gregory M. Nespole*
                                                  Joseph E. Levi
                                                  Gregory Mark Nespole
                                                  55 Broadway, 10th Floor
                                                  New York, NY 10006
                                                  T: (212) 363-7500
                                                  F: (212) 363-7171
                                                  E: jlevi@zlk.com
                                                     gnespole@zlk.com

                                                  *Attorneys for Lead Plaintiff and the Class*

25