**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN D. MEYER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED MICROELECTRONICS CORPORATION, SHAN-CHIEH CHIEN, JASON WANG, PO-WEN YEN, and CHITUNG LIU,<br><br>Defendants. | No. 19-cv-02304-VM<br><br><u>CLASS ACTION</u><br><br>Hon. Victor Marrero, U.S.D.J. |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**
**<u>AND INCENTIVE AWARD TO LEAD PLAINTIFF</u>**

LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
(212) 363-7500

*Attorneys for Lead Plaintiff and the Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 6

I.  A Reasonable Percentage of the Fund Recovered is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases .............................................. 6

II.  A Fee of 30% is Consistent with Fees Awarded in Comparable Cases in this District ........................................................................................................................ 7

III.  The Factors Considered within the Second Circuit Confirm that the Requested Fee is Reasonable ..................................................................................................... 9

    A.  Lead Counsel has Devoted Substantial Time and Labor to the Action ................... 9

    B.  The Magnitude and Complexity of the Action Support the Requested Fee .......... 10

    C.  The Risks of the Litigation Support the Requested Fee ....................................... 10

        1.  Risks Related to Liability ............................................................................ 11

        2.  Risks Related to Loss Causation, Damages and Market Efficiency .......... 12

        3.  Risks Related to Maintaining Class Certification ...................................... 14

        4.  Risks Related to the Collection of a Judgment .......................................... 14

        5.  The Contingent Nature of Counsel's Representation ................................. 15

    D.  The Quality of Plaintiff's Counsel's Representation ............................................ 16

    E.  The Requested Fee in Relation to the Settlement ................................................ 17

    F.  Public Policy Considerations Support the Requested Fee .................................... 17

    G.  The Requested Attorneys' Fees are Reasonable Under the Lodestar Cross-Check ................................................................................................................... 18

IV.  Lead Counsel's Expenses are Reasonable and were Necessarily Incurred to Achieve the Benefit Obtained ................................................................................ 20

V.  The Reaction of the Settlement Class to Date Supports the Requested Fee ...................... 21

CONCLUSION .................................................................................................................... 22

i

# TABLE OF AUTHORITIES

## CASES

*Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
MDL No. 03-1529, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ................................. 16

*Am. Bank Note Holographics, Inc. Sec. Litig*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ............................................................................ 15

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ....................................................................................... 16

*Apac Teleservs., Inc. Sec. Litig.*,
No. 97-cv-9145 (S.D.N.Y. June 29, 2001) ...................................................................... 8

*Apple Comput. Sec. Litig.*,
No. C-84-20148, 1991 WL 238298, at *1-2 (N.D. Cal. Sept. 6, 1991) ........................... 16

*BankAtlantic Bancorp, Inc.*,
No. 07-cv-61542 (S.D. Fla. 2010) ................................................................................. 16

*Basic Inc. v. Levinson*,
485 U.S. 224, 230-31 (1988) ......................................................................................... 17

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299, 310 (1985) ............................................................................................... 17

*Bayer AG Sec. Litig.*,
No. 03-cv-1546, 2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ..................................... 12

*Bentley v. Legent Corp.*,
849 F. Supp. 429 (E.D. Va. 1994) ................................................................................. 15

*Blech Sec. Litig.*,
No. 94 Civ. 7696, 2000 WL 661680 (S.D.N.Y. May 19, 2000) ....................................... 7

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ......................................................................................................... 6

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132 (CM), 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd*,
*Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015) ................................................. 6, 8

*Comverse Tech., Inc. Sec. Litig.*,
No. 06-1825, 2010 WL 2653354 (S.D.N.Y. June 24, 2010) ........................................... 20

*Deutsche Telekom AG Sec. Litig.,*
  No. 00-CV-9475 (NRB), 2005 WL 7984326 (S.D.N.Y. June 9, 2005) .......................... 20

*Dornberger v. Metro Life Ins. Co.*,
  203 F.R.D. 118, 124 (S.D.N.Y. 2001) ............................................................................. 21

*E.W. Blanch Holdings, Inc. Sec. Litig.*,
  No. 01-258, 2003 WL 23335319 (D. Minn. June 16, 2003)................................................ 8

*Flag Telecom Holdings Ltd. Sec. Litig.*,
  2010 WL 4537550, at *28 ................................................................................................ 14

*FLAG Telecom Holdings, Ltd.,*
  No. 02-cv 3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)........................................ 10

*Gierlinger v. Gleason*,
  160 F.3d 858 (2d Cir. 1998)............................................................................................. 19

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)................................................................................................. 6

*Heritage Bond Litig.*,
  No. 02–ML–1475 DT (RCx), 2005 WL 1594403 (C.D. Cal. June 10, 2005)................... 8

*Herman v. Legent Corp.*,
  50 F.3d 6 (4th Cir. 1995) ................................................................................................. 15

*Hicks v. Stanley*,
  No. 01-10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)........................................... 18

*Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12–cv–8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014)........................... 19

*IMAX Sec. Litig.,*
  No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) ................. 7

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) ....................................................................................... 8

*Klugmann v. Am. Capital Ltd.*,
  No. 09-cv-00005-PJM (D. Md. June 12, 2012) ................................................................. 8

*LaBranche Sec. Litig,*
  No. 03-cv-8201 (S.D.N.Y. Jan. 22, 2009) ......................................................................... 8

*Landy v. Amsterdam*,
  815 F.2d 925 (3d Cir. 1987)............................................................................................. 15

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................................... 8

*Marsh & McLennan, Co. Sec. Litig.*
    No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................ 17

*McDaniel v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)........................................................................................... 11

*MetLife Demutualization Litig.*,
    689 F. Supp. 2d 297 (E.D.N.Y. 2010) ............................................................................ 20

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)...................................................................................................... 19

*Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
    No. 06 Civ. 4270 (PAC), 2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) .......................... 7

*Newman v. Caribiner Int'l Inc.*,
    No. 99-cv-2271 (S.D.N.Y. Oct. 25, 2001) ......................................................................... 8

*Public Pension Grp. v. KV Pharm. Co.*,
    No. 08-cv-1859 (CEJ) (E.D. Mo. Apr. 23, 2014) ................................................................. 8

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ...................................................................................... 15

*Roberts v. Texaco*,
    979 F.Supp. 185 (S.D.N.Y. 1997)...................................................................................... 21

*Savoie v. Merchs. Bank,*
    166 F.3d 456, 460 (2d Cir. 1999)..................................................................................... 7

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
    No. 02-cv-2133 (D. Conn. Jan. 21, 2005).......................................................................... 8

*Shapiro v. JPMorgan Chase & Co.*,
    Nos. 11 Civ. 8831(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666, (S.D.N.Y. Mar.
    24, 2014) ........................................................................................................................ 12

*Sheppard v. Consol. Edison Co. of N.Y., Inc.*,
    2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002)...................................................................... 21

*Stefaniak v. HSBC Bank USA,  N.A.*,
    No. 05-720, 2008 WL 7630102 (W.D.N.Y. June 28, 2008)............................................. 7

*Taft v. Ackermans*,
    No. 02-cv-7951 (PKL), 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007)................................. 8

iv

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ................ 10

*Telik*, *Inc. Sec. Litig.*
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ................................................................................ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 319 (2007) .................................................................................................. 17

*Veeco Instruments Inc. Sec. Litig,*
    No. 05-1695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............................................ 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96, 121 (2d Cir. 2005) ........................................................................................ 7

*Wal-mart Stores, Inc. v. Visa USA, Inc.*,
    396 F. 3d 96, 123 (2d Cir. 2005) ...................................................................................... 20

*WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................................. 18

## OTHER AUTHORITIES

Securities Exchange Act of 1934 ............................................................................................ 3

## RULES

SEC Rule 10b-5 ...................................................................................................................... 5

v

Court-appointed lead counsel, Levi & Korsinsky LLP ("**Levi & Korsinsky**" or "**Lead Counsel**"), submits this memorandum of law in support of its motion for an award of attorneys' fees in the amount of 30% of the Settlement Fund, which would calculate to $900,000.[1] Lead Counsel also seeks payment of $22,300.51 in litigation expenses that Lead Counsel reasonably incurred in prosecuting this securities class action (the "**Action**"). Lead Counsel also moves for a incentive award to Court-appointed lead plaintiff, Mark Nelson ("**Lead Plaintiff**"), in the amount of $5,000.

## **PRELIMINARY STATEMENT**

The proposed Settlement now before the Court provides for the full resolution of the federal securities fraud claims against United Microelectronics Corporation ("**UMC**" or the "**Company**") and defendants Shan-Chieh Chien, Jason Wang, Po-Wen Yen, and Chitung Liu (the "**Individual Defendants**," and together with UMC, the "**Defendants**") in this Action, in exchange for a cash payment of $3,000,000 on the terms set forth in the Stipulation. For the reasons below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class in light of the significant risks of continuing to litigate this Action. The Settlement will provide valuable compensation to the Settlement Class while avoiding further delay and the significant risks of continued litigation.

---

[1] Capitalized terms which are not defined in this memorandum have the same meaning as in the Stipulation of Settlement dated June 30, 2020 and filed on July 27, 2020 (ECF 55-1, the "**Stipulation**"). Reference is made to the accompanying Declaration of Gregory M. Nespole (the "**Nespole Declaration**") and the Declaration of Mark Nelson ("**Nelson Declaration**"), both of which are in support of this motion. Reference is also made to the accompanying Declaration of Kari L. Schmidt Regarding Class Notice and Report on Requests for Exclusion Received (the "**Schmidt Declaration**").

The proposed Final Order and Judgment reflecting an award of attorneys' fees and expenses is attached to the Stipulation as Exhibit B thereto.

As alleged in the Amended Complaint (ECF 42) at ¶¶ 1-22 *et seq.*, UMC is a "pure play" foundry that fabricates integrated circuits based on designs and technology developed and provided by its customers. Though it allegedly lacks any significant, independent intellectual property in advanced DRAM (dynamic random access memory) technology, UMC nevertheless entered into an agreement to provide cutting-edge DRAM technology to Fujian Jinhua Integrated Circuit ("**Jinhua**"), an entity sponsored by the People's Republic of China ("**PRC**") to facilitate the PRC's technology "advancement" model by turning out state-of-the-art DRAM chips in mainland China. Lead Plaintiff alleges that Jinhua and Defendants had no intention of doing so through legitimate R&D and investment. As observed by Assistant U.S. Attorney General John Demers, Defendants allegedly schemed to "rob, replicate, and replace" technology developed by established firms like Micron Technologies, Inc. ("**Micron**") and then drive them from the market by selling the stolen technology at lower prices. Lead Plaintiff alleges that Defendants' scheme collapsed after Taiwanese prosecutors indicted UMC for misappropriating Micron's DRAM trade secrets; Micron sued UMC for theft of trade secrets and civil RICO; the U.S. Department of Justice indicted UMC, and the U.S. Attorney for the Northern District of California began a civil action against UMC. On news of the federal indictment and DOJ civil action, the price of UMC's American Depositary Shares ("**ADSs**") actively trading within the United States on the New York Stock Exchange fell by $0.19 per ADS over the following two trading sessions, a 10% drop, thus damaging the Settlement Class.

The benefits of the Settlement are clear when weighed against the risk that the Settlement Class might recover less (or nothing) if litigation continued. The proposed Settlement will provide a meaningful recovery in a case where Defendants would have had substantial defenses to liability, including challenges to scienter, damages, and loss causation. Defendants were

expected to vigorously argue on a motion to dismiss that Lead Plaintiff failed to state a claim under Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. Nespole Decl. ¶ 6. Defendants were expected to argue that Lead Plaintiff did not allege with particularity that the Individual Defendants had contemporaneous knowledge demonstrating the falsity of the statements at issue, *i.e.,* scienter. *Id.* Defendants were also expected to argue that Lead Plaintiff would be unable to demonstrate loss causation. *Id.* Defendants were further expected to argue that the market for the Company's ADSs was inefficient because they traded mostly in Asia and sparingly in the United States. *Id.*

While Lead Counsel believes that Lead Plaintiff had compelling counter arguments, there is a substantial risk that a motion to dismiss might result in the elimination of a significant portion – or even all – of the potential damages to the Settlement Class. Even if a motion to dismiss by Defendants were unsuccessful, Defendants would have continued to press their arguments at summary judgment and beyond. Litigation risks also include unusual challenges in discovery. Specifically, most if not all of the relevant witnesses, documents and other evidence are in Taiwan and mainland China. Nespole Decl. ¶ 7. There are well known difficulties in compelling testimony and cooperation from witnesses in those countries. Discovery would have been further complicated because Lead Plaintiff likely would have required discovery from individuals who were under indictment both in the United States and Taiwan, thus implicating their Fifth Amendment rights against self-incrimination in the United States and exposing them to the possibility of civil liability. *Id.* Even if Plaintiff had prevailed at trial, attempting to collect a U.S. judgment in Taiwan would result in further delay with uncertain prospects. Finally, the litigation could go on for years and deplete any available funds that could be used to compensate investors.

In the face of these risks – as well as the fully contingent nature of the case – Lead Counsel devoted substantial resources to prosecuting this Action against highly skilled opposing counsel. As detailed in the Nespole Decl. at ¶ 13, Lead Plaintiff, through counsel, diligently investigated the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included analyzing, among other things, publicly filed documents and records, investigative reports, and news stories; and reviewing and corroborating the allegations and developments. In particular, Lead Counsel reviewed, further researched, and took steps to corroborate the information and averments in (a) *United States v. United Microelectronics Corporation, et al.*, No. 18-cr-0465-MMC (N.D. Cal.) (the "**DOJ Criminal Action**"); (b) *United States v. United Microelectronics Corporation, et al.*, No. 3:18-cv-6643-MMC (N.D. Cal.), (c) filings in the Courts of Taiwan, including the Indictment Decision of Taiwan District Prosecutors Office, Case Nos. 106-Zhen-Tzu No. 11035, 4520, 5612, & 5613; and (d) *Micron Technology, Inc. v. United Microelectronics Corporation, et al.*, No. 3:17-cv-6932-MMC (N.D. Cal.). In addition, Lead Counsel consulted with certain experts regarding issues of market efficiency and damages suffered by Lead Plaintiff and the Class resulting from the claims in the Action.

As detailed in in the Nespole Decl. at ¶ 13, Lead Counsel conducted considerable research into the semiconductor industry. That investigation included understanding how RAM (random access memory), a well-known type of memory so-called because of its ability to access any location in memory with roughly the same time delay, operates in laptops, computers and other devices. Lead Counsel further studied DRAM, a specific type of RAM that allows for higher densities at a lower cost. With that, Lead Counsel learned and investigated how DRAM if often at the center of alleged trade secret violations and subject to sophisticated patent litigation across the globe. Lead Counsel spent substantial time studying how a DRAM cell is composed of

4

only two components – a transistor and capacitor – and that there was a very fine line between intellectual property theft and building out on open source data when discussing capacitator evolution. Simply stated, Lead Counsel knew from the outset of the litigation that Defendants were going to argue (and they did) that there was no theft of proprietary intellectual property but rather that UMC permissively built on and advanced open source data to manufacture its own chip. Lead Counsel needed to be sufficiently familiar with the concepts to address these defenses.

On the basis of the foregoing, Lead Plaintiff filed the 120-page Amended Complaint alleging claims against the Defendants pursuant to §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. (ECF No. 42). *See* Nespole Decl. ¶ 15. After the Court denied Defendants' request for a stay pending resolution of the DOJ Criminal Action (ECF No. 47) and before Defendants answered or otherwise moved with respect to the Amended Complaint, *see* Nespole Decl. ¶ 16, the Parties held a full day mediation session under the auspices of an experienced and highly respected mediator from JAMS, Jed Melnick, Esq. *Id.* ¶¶ 18-19. The Settlement is the result of this mediation. *Id.*

Against this backdrop, Lead Counsel requests a fee of 30% of the Settlement Fund, which represents a modest lodestar "multiplier" of 1.76, and payment of litigation expenses in the amount of $22,300.51. The requested fee is made with the full support of the Lead Plaintiff. *See* Nelson Decl. ¶ 5-7. As demonstrated below, the request is well within the range of attorneys' fees typically awarded in securities class actions and is well supported by both case law and the facts of this case. Lead Counsel also moves for a $5,000 incentive award to Lead Plaintiff in recognition of his active assistance to Lead Counsel in prosecuting this Action. *Id.* ¶ 3; Nespole Decl. ¶¶ 9, 14-15.

For the foregoing reasons, Lead Counsel respectfully submits that the requested fees, expenses and incentive award should be approved.

## ARGUMENT

**I.     A Reasonable Percentage of the Fund Recovered is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases**

Attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The purpose of the common fund doctrine is to fairly and adequately compensate counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation on their behalf. *See id.* at 47.

Courts have recognized that, in addition to providing just compensation, "awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132 (CM), 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd, Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).

The Second Circuit has authorized district courts to employ the percentage-of-the-fund method when awarding fees in common fund cases. *See Goldberger,* 209 F.3d at 47 (holding that the percentage-of-the-fund method may be used to determine appropriate attorneys' fees, although the lodestar method may also be used). In expressly approving the percentage method, the Second Circuit recognized that "the lodestar method proved vexing" and resulted in "an

6

inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48, 49; *Savoie v. Merchs. Bank,* 166 F.3d 456, 460 (2d Cir. 1999) (stating that "the percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").

Indeed, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005);[2] *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) ("This court … continues to find that the percentage of the fund method is more appropriate than the lodestar method for determining attorney's fees in common fund cases."); *In re IMAX Sec. Litig.,* No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) ("the percentage method continues to be the trend of district courts in the [Second] Circuit").

In sum, the weight of authority suggests that the Court should use the percentage-of-recovery method in determining a reasonable attorneys' fee here.

## II.      A Fee of 30% is Consistent with Fees Awarded in Comparable Cases in this District

Many courts within the Southern District of New York have previously awarded fees of 30% in comparably complex securities class actions. *See, e.g.*, *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit"); *Stefaniak v. HSBC Bank USA,  N.A.*, No. 05-720, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008)

---

[2] All internal quotations and citations are omitted unless otherwise stated.

(awarding 33% of fund, finding it "typical in class action settlements in the Second Circuit"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 368 (S.D.N.Y. 2002) (awarding $33^1/_3\%$ of $11.5 settlement and citing cases that also awarded over 30% including *In re Apac Teleservs., Inc. Sec. Litig.*, No. 97-cv-9145 (S.D.N.Y. June 29, 2001), where the court awarded $33^1/_3\%$ of a settlement, and *Newman v. Caribiner Int'l Inc.*, No. 99-cv-2271 (S.D.N.Y. Oct. 25, 2001), where the court awarded $33^1/_3\%$ of a settlement); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02-cv-2133, slip op. at 8-9 (D. Conn. Jan. 21, 2005) (awarding $33^1/_3\%$ of common fund);[3] *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) (awarding 33% of a settlement); *Taft v. Ackermans*, No. 02-cv-7951 (PKL), 2007 WL 414493, at *1, 11 (S.D.N.Y. Jan. 31, 2007) (awarding 30% of common fund); *In re LaBranche Sec. Litig*, No. 03-cv-8201, slip op. at 1 (S.D.N.Y. Jan. 22, 2009) (awarding 30% of common fund); *City of Providence,* 2014 WL 1883494, at *20 (awarding 33% of settlement).

The requested fee is also well within the range of percentage fee awards that have been granted in comparable securities class actions in other Circuits. *See, e.g., Public Pension Grp. v. KV Pharm. Co.*, No. 08-cv-1859 (CEJ), slip op. at 2 (E.D. Mo. Apr. 23, 2014) (awarding 30% of settlement); *Klugmann v. Am. Capital Ltd.*, No. 09-cv-00005-PJM, slip op. at 9 (D. Md. June 12, 2012) (awarding 33.3% of settlement); *In re Heritage Bond Litig.*, No. 02–ML–1475 DT (RCx), 2005 WL 1594403, at *23 (C.D. Cal. June 10, 2005) (awarding $33^1/_3\%$ of settlement); *In re E.W. Blanch Holdings, Inc. Sec. Litig.*, No. 01-258, 2003 WL 23335319, at *3 (D. Minn. June 16, 2003) (awarding $33^1/_3\%$ of settlement).

---

[3] All unreported decisions are submitted herewith in the compendium, arranged by alphabetical order, attached as **Exhibit A** to the Nespole Decl.

Accordingly, the 30% fee requested here is consistent with fees awarded in similar cases in this District and nationwide.

### III.    The Factors Considered Within the Second Circuit Confirm that the Requested Fee is Reasonable

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case, whether under the percentage common fund approach or the lodestar multiplier approach:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. As discussed below, these factors and the analyses herein demonstrate that Lead Counsel's requested fee is reasonable.

### A.    Lead Counsel has Devoted Substantial Time and Labor to the Action

The time and effort expended by Lead Counsel in prosecuting the Action and achieving the Settlement support the requested fee.

As set forth in greater detail in the Nespole Decl. at ¶ 13-14, Lead Counsel diligently investigated the claims, defenses, and underlying events and transactions that are the subject of the Action. Among other things, Lead Counsel analyzed publicly filed documents and records, investigative reports, and news stories; reviewed and corroborated the allegations and developments; reviewed, researched, and took steps to corroborate the information and allegations in the DOJ Criminal Action; the criminal action against UMC; the indictment decision of UMC in Taiwan; and Micron's suit against UMC for theft of trade secrets. Lead Counsel also consulted with experts regarding issues of market efficiency and damages suffered by Lead Plaintiff and the Class, and conducted considerable research into the semiconductor industry, the manufacture of DRAM, and issues raised in patent litigation relating to DRAM.

In connection with this work, Lead Counsel expended 650.2 hours with a lodestar value of $510,776.25. *See* Nespole Decl. ¶ 46. At all times, Lead Counsel took care to staff the matter efficiently and avoided unnecessary duplication of effort.

Accordingly, it is respectfully submitted that the time and labor dedicated to the litigation support the fee request.

### B. The Magnitude and Complexity of the Action Support the Requested Fee

The magnitude and complexity of the Action also support the requested fee. Courts routinely recognize that securities class action litigation is "notably difficult and notoriously uncertain." *City of Providence,* 2014 WL 1883494, at *5; *In re FLAG Telecom Holdings, Ltd.* No. 02-cv 3400, 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010) (same). This case was no different.

As discussed in the Nespole Declaration, this Action involved difficult, complex, and hotly disputed issues related to DRAM integrated circuits. Prosecuting the claims of the Settlement Class required skill and dedication. Accordingly, the magnitude and complexity of the Action supports the conclusion that the requested fee is fair and reasonable. *City of Providence*, 2014 WL 1883494, at *16 ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.").

### C. The Risks of the Litigation Support the Requested Fee

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). "Courts have repeatedly recognized that 'the risk of litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel in class actions." *In re Telik, Inc. Sec. Litig.* 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008). For this reason, the Second Circuit has said that "[t]he level of risk associated

10

with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of the multiplier." *McDaniel v. County of Schenectady*, 595 F.3d 411, 424 (2d Cir. 2010) (quoting *Goldberger*, 209 F.3d at 54).

While Lead Counsel remains confident in its ability to prove Lead Plaintiff's claims and to effectively rebut Defendants' defenses, it recognizes that proving liability and recovering damages for the Class was far from certain. The likelihood of a recovery was further complicated because the Company's primary operations, assets, documents and witnesses are located in Taiwan. The primary risks are discussed below. For a more detailed discussion, the Court is respectfully referred to the Nespole Declaration at ¶¶ 25-29 and the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Approval of Plan of Allocation at Point I(D)(4).

### 1.    Risks Related to Liability

Defendants were expected, in their motions to dismiss and beyond, to strongly dispute the existence of falsity and scienter, which would have required considerable legal skill to rebut. Absent the Settlement, there was a significant risk that the Court might have granted a motion to dismiss by Defendants in whole or in part on any of several grounds.

In particular, Defendants would likely have advanced several arguments to challenge the existence of an actionable misstatement or scienter. For example, Defendants were expected to argue, *inter alia*, that: (i) Lead Plaintiff did not plead scienter with particularity or plead particularized allegations that the Individual Defendants had contemporaneous knowledge of the falsity of the statements at issue, which results in no knowledge being imputed to the Company; (ii) Lead Plaintiff did not plead that any of the Individual Defendants personally benefitted from the alleged fraud, such as by selling their own shares at a profit; and (iii) Lead Plaintiff did not plead any actionable misstatement or omission because the alleged misstatements are protected

11

statements of corporate puffery and optimism. *See* Nespole Decl. ¶ 26.

These same arguments could have been continued at summary judgment, trial, or on appeal, and, in the absence of any settlement, presumably would have been. Thus, there were very significant risks in prevailing, had the case not settled, and no guarantee that Defendants' liability could be established. *See In re Bayer AG Sec. Litig.*, No. 03-cv-1546, 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008) (noting "the difficulty in proving that Defendants acted with scienter, militate in favor of fee awards."). Establishing liability would have been further complicated because most, if not all, of the relevant witnesses, documents and other evidence are in Taiwan and mainland China. There are well known difficulties in compelling testimony and cooperation from witnesses in those countries. Nespole Decl. ¶ 7. Moreover, Lead Plaintiff likely would have required discovery from individuals who were under indictment both in the United States and Taiwan, thus implicating their Fifth Amendment rights against self-incrimination in the United States and exposing them to the possibility of civil liability. *Id.*

### 2. Risks Related to Loss Causation, Damages and Market Efficiency

Whether Lead Plaintiff could demonstrate loss causation and damages and overcome issues of market efficiency could also vigorously challenged by Defendants and would continue to require a significant amount of effort on the part of Lead Counsel. "Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony." *Shapiro v. JPMorgan Chase & Co.*, Nos. 11 Civ. 8831(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014).

Lead Plaintiff anticipates that Defendants would have strenuously argued, in the motion to dismiss and thereafter, that, *inter alia*: (i) the material allegation in the 2018 federal indictment of the Company (that UMC stole trade secrets from Micron to develop DRAM) was previously disclosed in Micron's suit against the Company and a previous indictment of the Company in

Taiwan over a year earlier; (ii) any damages to the Class were *de minimis*, because, among other things, the price of the Company's ADSs actually increased after the 2018 federal indictment was made public and that any decrease in the price of the Company's ADSs was attributable to factors unrelated to the allegations in the Amended Complaint, such as unprecedented international trade tensions between China and the United States; and (iii) any damages would have been even further limited by issues of market efficiency since news affecting the prices of the ADSs that is released in Asia would not reach the United States until many hours (and in some instances days) later. *See* Nespole Decl. ¶ 27.

Issues surrounding market efficiency, namely whether UMC ADSs traded within the United States in an efficient market, were expected to present a notably substantial hurdle. Defendants were expected to argue, in the motion to dismiss and thereafter, that the Class could not avail itself of the "fraud-on-the-market" theory to establish reliance at the motion to dismiss stage or at class certification. This argument presented real risks because there was market price evidence that the trading patterns of UMC ADSs were at times inconsistent with the public information released concerning the Company's legal problems and earnings. This may have been a function of the time delay between news being released in Asia and then being reflected in the market price of UMC ADSs at a subsequent time. For example, news released at 4:00 pm on Friday in Taiwan would be seen at 3:00 am in New York. Accordingly, given translation issues and that analysts covering UMC with access to members of senior management would need to discuss the release, that information would likely not be fully understood until sometime the following Monday – after UMC had already traded in Asia earlier that day. Indeed, UMC ADSs in fact increased on news of the indictment in Asia, further complicating the issue of reliance. *See* Nespole Decl. ¶ 28.

13

In order for the Settlement Class to recover damages at the maximum level estimated by Lead Plaintiff's financial consultant, it would need to prevail on each and every one of the claims alleged and establish loss causation related to the alleged disclosures. The damage assessments of the Parties' trial experts would be sure to vary substantially, and expert discovery and trial would become a "battle of experts" requiring significant work on the part of Lead Counsel. *See, e.g., In re Flag Telecom Holdings Ltd. Sec. Litig.*, 2010 WL 4537550, at \*28 (burden in proving the extent of the class's damages weighed in favor of approving fee request).

### 3.    Risks Related to Maintaining Class Certification

Defendants would undoubtedly have raised vigorous challenges to class certification, and such disputes could well devolve into yet another battle of the experts. Additionally, class certification can be reviewed and modified at any time by the Court before final judgment. Although Lead Counsel believes there are strong grounds for certifying a litigation class, discussed in Lead Plaintiff's motion for preliminary approval of the Settlement (ECF 56) at Point II, the Settlement avoids any uncertainty with respect to class certification and risks of maintaining certification of the Settlement Class through trial and on appeal. Class certification would have faced the reliance and causation defenses discussed above and obtaining certification of a litigation class would have required significant effort on the part of Lead Counsel. *See* Nespole Decl. ¶ 30.

### 4.    Risks Related to the Collection of a Judgment

Lead Plaintiff's ability to recover was also negatively impacted by the Company's location. UMC is based and operates largely in Taiwan, *see* Nespole Decl. ¶ 7. Collecting a U.S. judgment in Taiwan would carry substantial expenses and require domesticating the judgment in Taiwan, which in turn would require retaining Taiwanese counsel and create further uncertain delay.

14

### 5.    The Contingent Nature of Counsel's Representation

Despite the uncertainties concerning the outcome of the case, Lead Counsel undertook this Action on an entirely contingent fee basis, assuming a substantial risk that the litigation would yield no or potentially little recovery and leave Lead Counsel uncompensated for its significant investment of time and expenses. Courts within the Second Circuit have consistently recognized that this risk is an important factor favoring an award of attorneys' fees. *See, e.g.*, *In re Am. Bank Note Holographics, Inc. Sec. Litig*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award").

Unlike counsel for defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses and would have received no compensation or expenses had this case not achieved a recovery for the Settlement Class. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy endeavor with no guarantee of ever being compensated. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient attorney and professional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to pay for the costs entailed. Indeed, there have been many class actions in which plaintiffs' counsel took on the risk of pursuing claims on a contingent basis, expended thousands of hours and millions of dollars in expenses and time and received nothing for their efforts.[4] This case could have been dismissed like so many others on

---

[4] *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversal of jury verdict of $81 million against accounting firm after a 19-day trial); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd*, *Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of its case to the jury); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation); *Anixter v. Home-*

Defendants' motions to dismiss or on summary judgment, leading to absolutely no recovery for the Settlement Class and no fee for Lead Counsel. Accordingly, the contingency risk in this case supports the requested attorneys' fee.

### D.    The Quality of Lead Counsel's Representation

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee.

Since the passage of the PSLRA, Levi & Korsinsky has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States. *See* **Exhibit B** to the Nespole Decl. (Levi & Korsinsky's firm resume). Here, Levi & Korsinsky has devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience.

The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  *See Flag Telecom*, 2010 WL 4537550, at *28; *Teachers Ret. Sys.*, 2004 WL 1087261, at *20. Defendants are represented by Herrick, Feinstein LLP and Lazare Potter Giacovas & Moyle LLP. These firms are respected as highly skilled and experienced securities lawyers and have significant resources. Faced with this formidable opposition, Lead Counsel was nevertheless able to develop Lead Plaintiff's case so as to resolve the Action on terms favorable to the Settlement Class. *See, e.g.*, *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, MDL No. 03-1529, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the

---

*Stake Prod. Co*., 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Comput. Sec. Litig*., No. C-84-20148, 1991 WL 238298, at *1-2 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions); *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542 (S.D. Fla. 2010) (granted defendants' motion for judgment as a matter of law on loss causation grounds following a plaintiffs' jury verdict), *aff'd,* 688 F. 3d 713 (11th Cir. 2012).

16

settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."), *aff'd*, 272 F. App'x. 9 (2d Cir. 2008).

### E.    The Requested Fee in Relation to the Settlement

"In determining whether the Fee Application is reasonable in relation to the settlement amount, the Court compares the Fee Application to fees awarded in similar securities class-action settlements of comparable value." *In re Marsh & McLennan*, *Co. Sec. Litig*. No. 04-8144, 2009 WL 5178546, at *19 (S.D.N.Y. Dec. 23, 2009); *see also In re Veeco Instruments Inc. Sec. Litig,* No. 05-1695, 2007 WL 4115808, at *4 (S.D.N.Y. Nov. 7, 2007) (noting that the fee awarded is "consistent with fees awarded in a similar class actions settlements of comparable value").  As discussed above, the attorneys' fees requested here are well within the range of percentage fee awards in comparable securities class action cases within this District.  *See* Point II, *supra.*

### F.    Public Policy Considerations Support the Requested Fee

The federal securities laws are remedial in nature and, to effectuate their purpose of protecting investors, it is respectfully submitted that courts should encourage meritorious private lawsuits such as this one. *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions provide "a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (noting that the court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions).

Courts within the Second Circuit have reasoned that if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29. Specifically, "[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005)); *see also Hicks v. Stanley*, No. 01-10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").

It is respectfully submitted that lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them. This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved. Public policy therefore supports awarding Lead Counsel's attorneys' fee request.

### G. The Requested Attorneys' Fees are Reasonable Under the Lodestar Cross-Check

To ensure the reasonableness of a fee awarded under the percentage method, the Second Circuit encourages a "crosscheck" against counsel's lodestar. *Goldberger*, 209 F.3d at 50. Under the lodestar method, a court must engage in a two-step analysis: first, to determine the lodestar, the court multiplies the number of hours each timekeeper spent on the case by each person's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work. *See, e.g., Flag Telecom*, 2010 WL 4537550, at *26 ("Under the lodestar method, a positive multiplier is typically applied to the lodestar in

18

recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagements, the skill of the attorneys, and other factors"). Performing the lodestar cross-check here confirms that the fee requested by Lead Counsel is reasonable and should be approved.

Lead Counsel has expended 650.2 hours in the prosecution of this case. Nespole Decl. ¶ 46. The resulting lodestar at the current rates is $510,776.25. *Id.* "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12–cv–8557 (CM), 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *see also Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (similar); *Telik,* 576 F. Supp. 2d at 589 n.10 (similar).

The hourly rates of Lead Counsel here range from $975 to $1,050 for partners, $450 to $650 for associates, and $300 to $375 for law clerks and professional staff. Nespole Decl. ¶ 47. "In determining the propriety of the hourly rates charged by plaintiffs' counsel in class actions, courts have continually held that the standard is the rate charged in the community where the services were performed for the type of services performed by counsel." *Telik,* 576 F. Supp. 2d at 589. In fact, "perhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis." *Id*. It is respectfully submitted that the hourly rates for attorneys and professional staff above are reasonable and customary within the securities class action bar. Nespole Decl. ¶ 47.

Thus, the amount of attorneys' fees requested by Lead Counsel ($900,000) represents a modest multiplier of 1.76 of its lodestar. Such a multiplier is well within the parameters used

throughout district courts in the Second Circuit and is additional evidence that the requested fee is reasonable. Indeed, lodestar multiples are commonly awarded within the Second Circuit. *See, e.g., Wal-mart Stores, Inc. v. Visa USA, Inc.*, 396 F. 3d 96, 123 (2d Cir. 2005) (upholding a multiplier of 3.5 as reasonable on appeal); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-1825, 2010 WL 2653354, at *5 (S.D.N.Y. June 24, 2010) (approving a 2.78 multiplier in case involving a $165 million settlement); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (approving a 3.96 multiplier); *Maley,* 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country").

Accordingly, it is respectfully submitted that the requested fee would be reasonable, whether calculated as a percentage-of-the-fund or in relation to Lead Counsel's lodestar.

## IV.    Lead Counsel's Expenses are Reasonable and were Necessarily Incurred to Achieve the Benefit Obtained

Lead Counsel's fee application includes a request for payment of litigation expenses, which were reasonably incurred and necessary to prosecute the Action. Lead Counsel incurred $22,300.51 in litigation expenses as set forth and itemized in the Nespole Declaration at ¶ 57. This amount is well below the $75,000 maximum expenses that the Notice informed potential Settlement Class Members that Lead Counsel may apply for, and which to date there has been no objections to.  Schmidt Decl. ¶ 13.

Of the total amount of requested expenses, $10,379.50 or approximately 46% was expended on the Mediator's services which lead to the Parties' agreeing to the proposed Settlement. Nespole Decl. ¶ 58. The other expenses for which Lead Counsel seeks payment are

20

the types of expenses that are necessarily incurred in securities class action litigation, principally electronic research ($11,685.14 or approximately 52%). *Id.* These expenses are properly recoverable by counsel. *See In re China Sunergy Sec. Litig.*, No. 07-cv-7895, 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation…'"). Lead Counsel does not seek reimbursement for routine overhead expenses such as photocopying and telephone calls. *Id.* ¶ 57.

## V.    The Reaction of the Settlement Class to Date Supports the Requested Fee

The reaction of the Settlement Class to date also supports the fee request. Through December 1, 2020, the Claims Administrator has mailed 18,275 copies of the Notice to potential Settlement Class Members and nominees informing them of, among other things, Lead Counsel's intention to apply to the Court for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and up to $75,000 in expenses. Schmidt Decl. ¶ 9, *id.* Exhibit A and Exhibit B. While the time to object to the fee and expense application does not expire until December 16, 2020, to date no objections have been received. *Id.* ¶ 13. If any objections should be timely submitted, Lead Counsel will address them in reply papers.

## VI.    Application for Incentive Award to Lead Plaintiff

Lead Counsel moves for a modest $5,000 incentive award for Lead Plaintiff. "Such awards are not uncommon and can serve an important function in promoting class action settlements." *Sheppard v. Consol. Edison Co. of N.Y., Inc.*, 2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002). "An incentive award is meant to compensate the named plaintiff for… any additional effort expended by the individual for the benefit of the lawsuit." *Dornberger v. Metro Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001). *See also Roberts v. Texaco*, 979 F.Supp. 185, 187-188 (S.D.N.Y. 1997) (approving incentive award for class plaintiff who "provided valuable

21

assistance to counsel in prosecuting the litigation); *Denney v. Jenkins & Gilchrist,* 230 F.R.D. 317, 355 (S.D.N.Y. 2005) (incentive awards serve a particularly important function where the named plaintiff participated actively in the litigation).

Here, Lead Plaintiff actively participated in the litigation by, among other things, (i) routinely communicating with Lead Counsel concerning this Action; (ii) remaining fully informed about case developments; (iii) continuing to research Micron, UMC and semiconductor industry developments; (iv) routinely reviewing the various pleadings and motions filed in this Action; (v) closely monitoring and actively participating in settlement discussions, and (vi) reviewing and offering comments and revisions to Lead Plaintiff's mediation statement, including providing charts and data to Lead Counsel concerning trends in the DRAM industry, in connection with the mediation which resulted in the Settlement. Nelson Decl. ¶ 3.  Lead Plaintiff spent a total of 22 hours prosecuting this action. *Id.* Lead Plaintiff's professional experience in the semiconductor field allowed him to give Lead Counsel significant assistance in the prosecution of the Action. Nespole Decl. ¶¶ 9, 13-14.

In light of the foregoing, Lead Counsel respectfully submits that a $5,000 incentive award is reasonable under the circumstances. *See Roberts*, 979 F.Supp. at 188 (incentive award of between $2,500 and $85,000 depending on participation in the action).

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 30% of the Settlement Fund and $22,300.51 in litigation expenses, award Lead Plaintiff an incentive award in the amount of $5,000, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
     December 2, 2020

**LEVI & KORSINSKY, LLP**

*/s/ Gregory M. Nespole*
Joseph E. Levi
Gregory Mark Nespole
55 Broadway, 10th Floor
New York, NY 10006
T: (212) 363-7500
F: (212) 363-7171
E: jlevi@zlk.com
   gnespole@zlk.com

*Attorneys for Lead Plaintiff and the Class*

23