**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN D. MEYER, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>UNITED MICROELECTRONICS CORPORATION, SHAN-CHIEH CHIEN, JASON WANG, PO-WEN YEN, and CHITUNG LIU,<br><br>               Defendants. | No. 19-cv-02304-VM<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF KARI L. SCHMIDT IN SUPPORT OF**
**LEAD PLAINTIFF'S UNOPPOSED MOTION FOR ENTRY OF AN ORDER**
**APPROVING DISTRIBUTION OF THE NET SETTLEMENT FUND TO AUTHORIZED**
**CLAIMANTS**

I, KARI L. SCHMIDT, hereby declare and state as follows:

1.      I am a Project Manager for Analytics Consulting, LLC ("Analytics"), which has its corporate office located in Chanhassen, Minnesota. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.      Analytics was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the above-captioned action (the "Action").[1] In its Order for Hearing and Notice Directing: (A) Issuance of Notice of Proposed Class Action Settlement; and (B) Setting Date for Final Settlement Fairness Hearing (ECF No. 57, the "Preliminary Approval Order"), the Court approved the retention of Analytics as the Claims Administrator. As Claims Administrator, Analytics has, among other things: (i) mailed the Notice of Pendency and Proposed

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Preliminary Approval Order or the Final Approval Order (both defined below).

Settlement of Class Action (the "Settlement Notice") and the Proof of Claim and Release form (the "Claim Form" or "Proof of Claim Form" and, together with the Settlement Notice, the "Settlement Notice Packet") to potential Class Members and brokers and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to maintain a case website (the "Case Website") and posted case-specific documents on it; (iv) caused the Summary Notice of Pendency and Proposed Settlement of Class Action (the "Summary Settlement Notice") to be published; (v) provided, upon request, additional copies of the Settlement Notice Packet to potential Class Members, brokers, and other nominees; and (vi) received and processed claims.

3. On May 3, 2021, the Court granted final approval of the Settlement and entered the Final Judgment and Order Granting Final Approval of Settlement, Awarding Attorneys' Fees and Expenses and Incentive Award, and Dismissal with Prejudice (ECF No. 73, the "Final Approval Order"). In its Final Approval Order, the Court approved the proposed plan of allocation for the proceeds of the Settlement set forth in the Settlement Notice (the "Plan of Allocation"). Analytics has completed processing all claims received through October 15, 2021 in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation, and hereby submits its administrative determinations accepting and rejecting the claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants as contemplated in Lead Plaintiff's Motion for Entry of an Order Approving Distribution of the Net Settlement Fund to Authorized Claimants.

## DISSEMINATION OF NOTICE

4. As more fully described in the Declaration of Kari L. Schmidt Regarding Class Notice and Report of Requests for Exclusion Received (ECF No. 62, the "Mailing Decl."), as of December 1, 2020, Analytics had mailed 18,275 Settlement Notice Packets to potential Class Members and their nominees. Mailing Decl. ¶ 9. Since that date, 22,680 additional Settlement

Notice Packets have been disseminated. In total, Analytics has disseminated 40,955 Settlement Notice Packets to potential Class Members, brokers, and other nominees.  This total does not include Settlement Notice Packets available for download from the Case Website.

5.    Analytics established and continues to maintain the Case Website (www.UMCSecuritiesLitigation.com) and a toll-free telephone helpline (1-855-917-4968) to assist potential Class Members. The Case Website, which provides access to important documents relevant to the Settlement, and the telephone helpline, enable Class Members to obtain information about the Settlement.

6.    In accordance with Paragraph 7(b) of the Preliminary Approval Order, on August 28, 2020, Analytics caused the Summary Settlement Notice to be published in the *PR Newswire*. Mailing Decl. ¶ 10.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.    Under the terms of the Preliminary Approval Order at Paragraph 10(a) and as set forth in the Settlement Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Analytics a properly executed Claim Form postmarked no later than January 8, 2021, together with adequate supporting documentation for the transactions and holdings reported in the claim. Through October 15, 2021, Analytics has received and fully processed 2,470 claims (the "Presented Claims").

8.    In preparation for receiving and processing claims, Analytics: (i) conferred with Lead Counsel to define the guidelines for processing claims; (ii) created a unique database to store claim details, images of claims, and supporting documentation (the "Settlement Database"); (iii) trained staff in the specifics of the Settlement so that claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Class Members' identifying

information and transactional information; and (vi) developed a proprietary "calculation module" that would calculate a "Recognized Claim" pursuant to the Court-approved Plan of Allocation of the Net Settlement Fund as set forth in the Court-approved Settlement Notice.

9.      Class Members seeking to share in the Net Settlement Fund were directed in the Settlement Notice to submit their claims to a post office box address specifically designated for the Settlement. Settlement Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the Settlement Database and Settlement Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING CLAIMS

### A.      Paper Claims

10.      Of the 2,470 Presented Claims, 563 are paper claims. Once received, the paper claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper claims is very laborious and time-intensive. Once prepared, paper claims were scanned into the Settlement Database together with all submitted documentation. Subsequently, each claim was assigned a unique claim number. Once scanned, the information from each claim (including the claimant's name, address, and account number/information from the supporting documentation and the claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the claim) was entered into the Settlement Database. Once entered into the Settlement Database, each claim was reviewed to verify that all required information had been provided. The documentation provided by the claimant in support of the claim was reviewed for authenticity and compared to the information provided in the claim to

verify the claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the claim.

11.     To process the transactions detailed in the claims, Analytics utilized internal codes ("deficiency codes") to identify and classify deficiency or ineligibility conditions existing within those claims. Appropriate deficiency codes were assigned to the claims as they were processed. For example, where a claim was submitted by a claimant who did not have any eligible transactions in UMC American Depositary Shares during the Class Period (e.g., the claimant purchased UMC American Depositary Shares only before or after the Class Period), that claim would receive a deficiency code that denoted ineligibility. Similar deficiency codes were used to denote other ineligible conditions, such as duplicate claims. These deficiency codes would indicate to Analytics that the claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

- No Documentation Submitted for the Entire Claim

- Duplicate Claim Submitted

- No Eligible Purchase During the Class Period

- No Signature

- No Recognized Claim

- No Proof of Unsold Holdings

12.     Because a claim may be deficient only in part, but otherwise acceptable, Analytics utilized deficiency codes that were applied only to specific transactions within a claim. For example, if a claimant submitted a claim with supporting documentation for all but one purchase transaction, that one transaction would receive a transactional-specific deficiency code. The

deficiency code indicated that although the transaction was deficient, the claim was otherwise eligible for payment if other transactions in the claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation. Thus, even if the deficiency was never cured, the claim could still be partially accepted. Examples of transaction-specific deficiency codes are as follows:

- Claim did not Balance/Trade Discrepancy

- Inadequate Documentation for transaction

- Received Shares (i.e., shares transferred into or out of an account)

**B.    Electronic Claims**

13.    Of the 2,470 Presented Claims, 1,907 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors ("Electronic Claim Filers" or "E-Claim Filers") who may have hundreds or thousands of transactions during the relevant class period. Rather than provide reams of paper requiring data entry, the E-Claim Filers either mail a computer disc or electronically submit a file of Electronic Claims to Analytics so that Analytics can upload the Electronic Claims to the Settlement Database.

14.    Analytics maintains an electronic filing operations team (the "Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Analytics' required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Analytics notified the E-Claim Filer. If the electronic file was deemed to be in an acceptable format, it was then loaded to the Settlement Database.

15.    Once each electronic file was loaded, the Electronic Claims were coded to denote any deficient or ineligible conditions that existed within them. These deficiency codes are similar

to those applied to paper claims. In lieu of manually applying deficiency codes, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions such as, but not limited to, price out-of-range issues, out-of-balance conditions, or transactions outside the Class Period. The output was thoroughly verified and confirmed as accurate.

16.     The review process also included deficiency coding any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all claims referenced on the electronic file submitted. This process was reviewed by Analytics' Electronic Filing Team and, when appropriate, Analytics contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed claims, submitted by properly authorized representatives of the claimants, were considered eligible for payment from the Net Settlement Fund.

17.     At the end of the process, Analytics performed various targeted reviews of Electronic Claims. Specifically, Analytics used criteria such as the calculated Recognized Claim and other identified criteria to reach out to a number of E-Claim Filers and request that various sample purchases, sales, and holdings selected by Analytics be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by claimants does not contain inaccurate information.

### OBJECTIONS AND EXCLUDED PERSONS

18.     Shareholders had until December 16, 2020 to object to the Settlement.  As of the date of this Declaration, Analytics has received no objections.

19.     Shareholders had until December 16, 2020 to request exclusion from the Settlement.  As of the date of this Declaration, Analytics has received one request for exclusion,

attached to the Supplemental Declaration of Kari L. Schmidt Regarding Class Notice and Report on Requests for Exclusion Received. (ECF No. 66).

20.    Analytics also reviewed all claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent that the identities of such persons or entities were known to Analytics through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Settlement Notice and from the claimants' certifications on the Proofs of Claim.

## THE DEFICIENCY PROCESS

### A.    Paper Claims

21.    Approximately 68% of the paper claims, i.e., 381 of the 563 paper claims, were incomplete or had one or more defects or conditions of ineligibility, such as the claim not being signed, not being properly documented, or indicating no eligible transactions in UMC American Depositary Shares during the Class Period. The "Deficiency Process," which primarily involved sending letters or emails to claimants and responding to communications from claimants by email and/or telephone, was intended to assist claimants in properly completing their otherwise deficient submissions so they could be eligible to participate in the Settlement.

22.    If a paper claim was determined to be defective, a Notice of Deficient Proof of Claim Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) in the claim and what, if anything, was necessary to cure the defect(s) in the claim. The Deficiency Notice advised claimants that submission of appropriate information and/or documentary evidence to complete a claim had to be sent within ten (10) days from the date of the Deficiency Notice or the claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised claimants that to contest these administrative determinations, they were required to submit written statements to Analytics

requesting Court review of their claims and setting forth the basis for such requests. Analytics sent a total of 381 Deficiency Notices to claimants who filed paper claims that Analytics determined to be defective or ineligible. Attached hereto as **Exhibit A** is an example of a Deficiency Notice.

23. Claimants' responses to Deficiency Notices were scanned into the Settlement Database and associated with the corresponding claims. The responses were then carefully reviewed and evaluated by Analytics' team of processors. If a claimant's response corrected the defect(s), Analytics manually updated the Settlement Database to reflect the changes in the status of the claim. If a claimant did not respond to a Deficiency Notice, the claim was re-reviewed by Analytics to determine, to the extent possible, the portion of the claim that could be granted given the uncured deficiencies. No claim was rejected solely for failure to submit the appropriate information or documentary evidence to complete the claim within the ten (10) days required by the Deficiency Notice.

## B. Electronic Claims

24. For Electronic Claims, Analytics used the following process to contact 27 E-Claim Filers, consisting of 1,210 deficient Electronic Claims, who submitted deficient or ineligible Electronic Claims. These E-Claim Filers were sent an email ("Deficient Claims Email") to the email address included with the Claim Form. The Deficient Claims Email contained a link to a secure email portal that provided access to electronic versions of Deficiency Notices that contained detailed information about the deficient claim(s) and indicated which claim(s) within a filing were deficient and/or rejected. Analytics sent a total of 27 Deficient Claims Emails to E-Claim Filers, providing Deficiency Notices for 1,210 Electronic Claims that Analytics determined to be defective or ineligible.

25.    As with the paper claims, the Deficiency Notices contained the following information:

(a)    Notified the E-Claim Filer that any claims with deficiencies not corrected within ten (10) days from the date of the Deficient Claims Email may be rejected;

(b)    Advised the E-Claim Filer of the right to contest the rejection of the claim(s) and request this Court's review of Analytics' administrative determination within ten (10) days from the date of the Deficient Claims Email; and

(c)    Provided instructions for how to submit corrections.

26.    Analytics monitored the secure email system to verify that each of these E-Claim Filers received the Deficient Claims Email and accessed the correspondence regarding the deficient claims. In instances where an E-Claim Filer did not access the correspondence regarding deficient claims, Analytics contacted the E-Claim Filer by phone and email to remind the E-Claim Filer of the correspondence and response deadlines. Where necessary, Analytics made alternative arrangements for the delivery of the correspondence.

27.    Analytics has sent a Deficient Claims Email to 27 E-Claim Filers. Samples of a Deficient Claims Email with an electronic version of a Deficiency Notice are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

28.    The E-Claim Filers' responses were reviewed by the Electronic Filing Team, scanned and/or loaded into Analytics' database, and associated with the corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, Analytics manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim. No claim was rejected solely for failure to submit the appropriate information

10

or documentary evidence to complete the claim within the ten (10) days required by the Deficient Claims Email.

## NO DISPUTED CLAIMS

29.     As noted above, claimants were advised of the right to contest Analytics' administrative determination of deficiencies or ineligibility within ten (10) days from the date of the Deficiency Notice or Deficient Claims Email and that they could request that the dispute be submitted to the Court for review. More specifically, claimants were advised in the Deficiency Notice that, if they disputed Analytics' determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination.

30.     No claimants have contested Analytics' administrative determinations and requested review by the Court. There are, therefore, no disputed claims requiring Court review.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

31.     Of the Presented Claims, 193 were received or postmarked after the January 8, 2021 claim submission deadline established by the Court. Analytics processed all late claims received through October 15, 2021 and 66 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Analytics has not rejected any claim received through October 15, 2021, solely based on its late submission, and Analytics believes no delay has resulted from the provisional acceptance of these Late but Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended for payment.

32.     However, there must be a final cut-off date after which no additional claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional claims received during the finalization

11

of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, Analytics also respectfully requests that this Court order that no claim received after October 15, 2021, be eligible for payment in the distribution for any reason whatsoever subject only to the provision of paragraph 42(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Lead Counsel has determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to warrant the processing of claims received after October 15, 2021, these claims will be processed and, if any would have been eligible if timely received, these claimants may be paid the distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent permitted by the amount of remaining funds. *See* ¶ 42(f) below. With respect to previously filed claims that are cured or adjusted after the submission of Plaintiffs' motion, such claims will be reevaluated upon receipt of the adjustment and, to the extent they are found eligible for payment in the distribution or in subsequent distributions, they will be treated in the same manner as claims received after October 15, 2021. However, should an adjustment be received that results in a lower Recognized Claim, that adjustment will be made and the Recognized Claim amount will be reduced accordingly prior to a distribution to that claimant.

## <u>QUALITY ASSURANCE</u>

33.     An integral part of the claims administration process is the Quality Assurance review. Throughout the administration process, Analytics' Quality Assurance personnel worked to verify that claims were processed properly by ensuring that information was entered correctly into the Settlement Database, deficiency and/or rejection codes were assigned accurately, and

Deficiency Notices and Deficient Claims Emails were sent appropriately. After all claims were processed, deficiency and/or rejection notification sent, and claimants' responses to the Deficiency Notices were reviewed and processed, Analytics' Quality Assurance personnel performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all claims processed prior to preparing this declaration and all Analytics' final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, Analytics:

(a)    Verified that all Proofs of Claim had signatures of authorized individuals;

(b)    Verified that true duplicate claims were identified, verified, and rejected;

(c)    Verified that persons and entities excluded from the Class did not file claims or their claims were rejected upon review;

(d)    Performed a final Quality Assurance review of claims and all supporting documentation to ensure completeness of claims;

(e)    Determined that all claimants requiring deficiency and/or rejection notification were sent Deficiency Notices;

(f)    Performed a review of deficient claims;

(g)    Performed additional review of claims with high Recognized Claim amounts;

(h)    Reviewed claims that were designated invalid;

(i)    Reviewed claims with a Recognized Claim amount equal to zero;

(j)    Performed other targeted reviews based on claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(k)    Re-tested the accuracy of the Recognized Claim amount calculation program.

34.    As part of its due diligence in processing the claims, Analytics reviewed and compared the entire Settlement Database against the "watch list" of known questionable filers that Analytics has developed throughout its years of experiences as a claims administrator. Analytics performs searches based on names, aliases, addresses, and city/zip codes. In addition, Analytics' claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by claimants not previously captured in the "watch list." Processors are instructed to flag any claim that matches to a record on the "watch list" and escalate it to management for review. No claims were identified as having been submitted by someone on the "watch list."

## RECOMMENDATIONS FOR APPROVAL AND REJECTION

35.    As noted above, the number of claims on this motion is 2,470.

### Timely Submitted and Valid Claims

36.    A total of 2,277 claims were received or postmarked on or before the Court-approved claim submission deadline of January 8, 2021, of which 937 were determined by Analytics to be eligible and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Timely Eligible Claims is $16,755,537.02.

### Late But Otherwise Eligible Claims

37.    A total of 193 of the Presented Claims were received or postmarked after the Court-approved claim submission deadline of January 8, 2021, but received on or before October 15, 2021. Of those claims, 66 were determined by Analytics to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for these Late But Otherwise Eligible Claims is $694,661.33.

14

**Rejected Claims**

38.     Analytics sent a total of 1,591 Deficiency Notices.  Of these, 381 Deficiency Notices were mailed to claimants who submitted paper claims.  The remaining 1,210 Deficiency Notices were emailed to 27 E-Claim Filers. After the responses to Deficiency Notices were processed, a total of 1,467 Presented Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

(a)     94 claims had no purchase(s) of UMC American Depositary Shares during the Class Period;

(b)     1,263 claims did not result in a Recognized Claim;

(c)     2 claims were duplicates;

(d)     108 claims had uncured conditions of ineligibility.

**Lists of All Presented Claims**

39.     Attached hereto are listings of all the Presented Claims:

(a)     **Exhibit D** lists the Timely Eligible Claims and shows each claimant's Recognized Claim;

(b)     **Exhibit E** lists the Late But Otherwise Eligible Claims and shows each claimant's Recognized Claim; and

(c)     **Exhibit F** lists the Rejected Claims and the reasons for rejection.

## FEES AND DISBURSEMENTS

40.     Analytics agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Lead Counsel received reports on and invoices for the work Analytics performed with respect to the provision of notice and administration of the Settlement. Attached hereto as **Exhibit G** is Analytics' invoice for its work performed on behalf of the Class as well as an estimate for the work that will be performed and the costs that will be incurred in

15

connection with the initial distribution of the Net Settlement Fund.[2] As set forth in this invoice, the cost of administration for this project through the initial distribution is $99,160.63 in fees and expenses.

### DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

41.     Should the Court concur with Analytics' determinations concerning the provisionally accepted and rejected claims, including the Late But Otherwise Eligible Claims, Analytics recommends the following distribution plan (the "Distribution Plan"):

(a)     Analytics will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 5% reserve to address any tax liability and claims administration-related contingencies that may arise, as follows:

(1)     Analytics will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, Analytics will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(2)     Analytics will, pursuant to the terms of the Court-approved Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose combined *pro rata* shares of the Net Settlement Fund calculate to less than $10.00.

---

[2] This estimate will be set aside before the initial distribution is conducted so that Analytics can calculate Authorized Claimants' *pro rata* distribution amounts. Should the estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund exceed the actual cost to conduct the distribution, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants.

These claimants will not receive any payment from the Net Settlement Fund, and Analytics will send notifications to those Authorized Claimants advising them of that fact.

(3)     After eliminating claimants who would have received less than $10.00, Analytics will recalculate the *pro rata* share of the Net Settlement Fund for all Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(1) above.

(4)     The remaining 5% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(b)     In order to encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 120 DAYS AFTER ISSUE DATE]."[3]

---

[3] For Authorized Claimants whose checks are returned as undeliverable, Analytics will use reasonable methods to locate new addresses. When a new address is located, Analytics will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages a distribution check or otherwise requires a new check, Analytics will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Analytics will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, Analytics' outreach program, described in the preceding sentences, shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within 90 days of the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than 45 days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions, should such distributions occur, will be handled in the same manner.

(c)     Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be redistributed to other Authorized Claimants in the second distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks, should such distributions occur, within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)     Consistent with the Court-approved Plan of Allocation, after Analytics has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described in footnote 3, but not earlier than six (6) months after the Initial Distribution, Analytics will, after consulting with Lead Counsel, conduct a second distribution of the Net Settlement Fund (the "Second Distribution"). Any amounts remaining in the Net Settlement Fund after the Initial Distribution (including from the Reserve and the funds allocated for all void, stale-dated checks), after deducting Analytics' fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid, including Analytics' estimated costs of the Second Distribution, and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants who cashed their Initial Distribution checks and who would receive at least $10.00 from a Second Distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter in six-month

18

intervals until Lead Counsel, in consultation with Analytics, determines that further distribution is not cost-effective.

(e)    Notwithstanding the foregoing, if Lead Counsel and Analytics determine that the Second Distribution is not feasible in light of its associated costs, the amount remaining in the Net Settlement Fund will be used for a *cy pres* award to the New York Legal Aid Society, a nonsectarian Section 501(c)(3) organization, subject to approval by the Court.

(f)    No new claims may be accepted after October 15, 2021, and no further adjustments to previously received claims that would result in an increased Recognized Claim amount may be made, subject to the following exception. If claims are received or modified that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then, at the time that Lead Counsel, in consultation with Analytics, determines that a redistribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such claimants, at the discretion of Lead Counsel, may be paid the distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent possible.

(g)    Unless otherwise ordered by the Court, Analytics may destroy the paper copies of the claims and all supporting documentation one year after the Initial

19

Distribution, and one year after all funds have been distributed may destroy electronic copies of the same.

## CONCLUSION

42.    Analytics respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the claims submitted herein and approving the proposed Distribution Plan. Analytics further respectfully submits that its fees and expenses, as reflected on the invoices attached hereto as Exhibit G, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of December 2021.

Kari L. Schmidt